# EXHIBIT 4

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| Deyanna Ostroushko | ) | District Court File No. |
| v | ) | 27-HA-CV-26-853 |
| Savanah Hernandez | ) | |

---

HARASSMENT HEARING

---

HEARD BEFORE

THE HONORABLE NAOMI GARFINKEL

APPEARANCES:

JAMES COOK, Attorney at Law, appeared on behalf of Petitioner.

TRISHA POHLAND, Attorney at Law, appeared on behalf of Petitioner.

ELIZABETH NIELSEN, Attorney at Law, appeared on behalf of Respondent.

JESSE FRANKLIN-MURDOCK, Attorney at Law, appeared on behalf of Respondent.

COURT REPORTER: Crystal Ziebarth

P R O C E E D I N G S

(WHEREUPON, the following proceedings commenced on June 25, 2026, at 1:01 p.m.:)

THE COURT: Everyone hear me?

Thumbs up if you can hear me.

Excellent. Thank you.

All right.

We are on the record this afternoon in the consolidated files of 27-HA-CV-26-1116 and 27-HA-CV-26-853.

My name is Naomi Garfinkel. I'm the judicial officer assigned to this matter. The rules of our Zoom meeting are that no one should be recording this. Pictures and video are strictly prohibited, and we ask that you refrain from using the group chat function on the Zoom. I'm going to have the petitioners introduce themselves. If you could unmute, and each of you say -- state your name and spell your last name. And this is to the Ostroushko -- if I'm pronouncing that correctly -- litigants.

Go ahead.

Can the petitioners unmute and introduce themselves, please?

MS. OSTROUSHKO: Can you not hear me? Hello?

THE COURT: Oh. Now I can. Go ahead.

MS. OSTROUSHKO: Hi. Hello. Good afternoon.
My name is DeYanna Ostroushko.
THE COURT: Okay.
And, sir?
MR. COOK: Good morning. Good morning, Your Honor. James Cook here. I'm still working on getting my video up, but --
My name is James Cook. I'm an attorney. I represent Chris and DeYanna Ostroushko.
THE COURT: Oh.
MR. COOK: And I'm joined by co-counsel Trisha Pohland.
THE COURT: Oh. Okay.
Did you file a Certificate of Representation, Counsel?
MR. COOK: Yes.
THE COURT: Into these cases?
MR. COOK: Into these cases. Yes.
THE COURT: Okay.
Is there a reason why we can't see your face?
MR. COOK: I'm actually trying to bring that up. I'm kind of working on my video here. It's just taking me a second -- a moment to get this up.
But, yeah, I'm trying to bring up my camera.
THE COURT: Okay.

So, just for our record, I did not realize that the petitioners are represented. We haven't received the Certificate of Representation, so that's why I spoke with the petitioners.

MR. COOK: Are you saying --

THE COURT: What's that?

I'm just explaining why I spoke directly to the represented litigants.

MR. COOK: Okay. No problem.

THE COURT: All right.

So we're going to move on with the Respondents' counsel.

If you could please introduce yourselves.

MS. NIELSEN: Good morning, Your Honor.

My name is Elizabeth Nielsen. I am local counsel for the Respondent, and I am joined today by Jesse Franklin-Murdock, who will be leading our representation this afternoon.

MR. FRANKLIN-MURDOCK: Good morning, Your Honor. Jesse Franklin-Murdock for the Respondent, and the Respondent, Savanah Hernandez, is present on Zoom.

THE COURT: I see that.

All right.

Welcome, everyone.

I'm still waiting for Mr. Cook to appear, so

to speak.

Do you want to see if we can --

MR. COOK: Hi, Judge.

Do you see us now?

THE COURT: Nope.

All right. Just for purposes of our recordkeeping, we're waiting for Mr. Cook and his counsel -- and his co-counsel to turn on their cameras.

MR. COOK: One, six, four, five. Yep. This is the ID. Seven, five, nine. Yep. Seven, five, five, one. Okay. Seven -- or, nine, five, five, four -- oh, one. Okay. And we got to join. Let's see if we can fit in this picture. Fit multiples in the picture. Garfinkel's Zoom calendar. Okay. It says we're letting them know that you have attempted to join. It says Garfinkel's Zoom calendar.

THE COURT: Sir, you're already in our calendar. You're in our hearing. We're making a record of this conversation. We're just asking you -- I'm just asking you to please turn on your camera.

MR. COOK: So, it says that we're in the meeting -- or, we're waiting -- it says host has joined. We've let them know that you're waiting.

So, we're in a waiting room, is my understanding.

THE COURT: Okay.

Well, my understanding, sir, is that you're with us.

MS. POHLAND: Can you see me now?

Can you see us?

THE COURT: I can see two people. I don't -- I -- yep.

And are you in the same location as the petitioners? Is that where we're getting some feedback?

MR. COOK: No. We're not in the same location. We're in the same city, but -- you know, they're at their home. We're at --

THE COURT: Okay.

MR. COOK: We're at our office.

THE COURT: Okay. All right.

All right. And so, I'm going to ask that both of the attorneys introduce themselves, starting with Mr. Cook.

MR. COOK: Yeah.

Again, James Cook here, attorney, and I represent with my co-counsel, the Ostroushkos.

MS. POHLAND: And I'm Trisha Poland, T-R-I-S-H-A P-O-H-L-A-N-D, co-counsel to James Cook, representing the Ostroushkos.

THE COURT: Okay.

And so, we're just going to get going.

Let's see here.

Do you want me to swear in your clients first, counsel?

Mr. Cook?

MR. COOK: You're asking us?

THE COURT: I am yep.

MR. COOK: Yes, please.

THE COURT: Yep.

MR. COOK: You're asking both petitioners, correct?

THE COURT: Yeah. So, I need --

MR. COOK: Yes, please.

THE COURT: Okay.

I'm going to ask both parties to raise their right hands, so I can swear you in.

Do you swear or affirm to tell the truth.

MR. OSTROUSHKO: Yeah.

MS. OSTROUSHKO: Yes.

(Mr. Ostroushko was placed under oath.)

(Ms. Ostroushko was placed under oath.)

THE COURT: Thank you. You can put your hands down. I'll start with -- no. You'll have to stay unmuted.

If you could each state your name again and provide me with your date of birth.

MS. OSTROUSHKO: DeYanna Ostroushko, 8-16-79.

MR. OSTROUSHKO: And Chris or Christopher Ostroushko, 3-28 of 75.

THE COURT: All right. Thank you.

Go ahead, counsel.

Mr. Cook?

Or Ms. Pohland?

MS. POHLAND: If you could hold on one minute, please. We're just trying to get this set up. Just trying to make sure that we --

MR. COOK: Okay.

Well, what did you say, Your Honor?

I apologize.

THE COURT: I'm inviting you to inquire of your clients at this time.

MR. COOK: Okay. So, yeah, I --

Just to start off, I'm going to start with mister -- with Chris Ostroushko.

CHRISTOPHER OSTROUSHKO,

The witness in the above entitled matter after having been duly sworn testifies and says as follows:

D I R E C T E X A M I N A T I O N

BY MR. COOK:

Q. Mr. Ostroushko, do you understand why you're here today?

THE COURT: You'll need to respond again, sir.

MR. COOK: You have to -- remember, you have to respond --

A. I do. I do. Yes.

Q. Okay.

A. I understand why I'm here. Yes.

Q. Okay. And what is your understanding of why we're here today?

A. My understanding? You're asking me right now?

Q. Yes. I'm talking to you, specifically. We're talking to you, for the record.

A. Oh. Oh. Well, to -- to uphold the orders for protection that we asked for.

Q. Okay.

And why are you asking for an order of protection?

A. Because ever since the incident happened out at Whipple on April 11th, I believe it was, we've been harassed and doxxed, and we've noticed that the super spreaders all originate from one person.

Q. Okay. Okay.
So, I want to refrain from using any slang or colloquialisms, you know, so to speak.
So, explain what you mean by super spreaders and that type of thing.
What exactly are you trying to say?
A. Well, we've been doxxed -- we've been doxxed online; our addresses, phone numbers, businesses, jobs. We have people coming through our neighborhood, flyering, threatening us. I go out, I get threatened; and the defendant, I guess is what you would call her, doesn't seem to be quelling the fire. She seems to be stoking it and not putting an end to it. You know?
I -- people -- I've run into people out there that are behind me, and they -- you know, they're telling me that I should have done things, and blah, blah, blah. And it's like, no, no. That's never the answer.
So, I'm always -- I'm trying to push things down, where the other parties are --
Q. Mr. Ostroushko, I've got to interrupt you.
Okay?
A. Yeah.
Q. Make sure you listen carefully to the question that I'm asking you, and, as much as you can, try to directly

answer the question.

Okay?

So, I'm going to back up, and I'll --

Judge, I'll move to strike everything after my last question.

So, again, Mr. Ostroushko, you -- you understand you're here today, and you're requesting a --

MR. COOK: Judge, if you'll allow me just some brief cross-examination, or -- you know, asking with leading questions.

BY MR. COOK:

Q. You're here today because you --

MR. FRANKLIN-MURDOCK: Your Honor, I object to counsel leading his own client.

MR. COOK: Okay. But it's just to get -- just to get information, counsel.

THE COURT: Okay. Stop. Stop.

So, we're -- we're going to each -- all of us need to speak individually. We can't speak over each other. Ask the question, and then you can object. But, I can't rule on an objection for a question that hasn't been asked.

Go ahead, Mr. Cook.

BY MR. COOK:
Q. Okay.
So, Mr. Ostroushko, you're here today because you're requesting that the Court grant you a permanent restraining order against Ms. Hernandez; is that correct?
A. That is correct.
MR. FRANKLIN-MURDOCK: Your Honor, objection. Counsel should not be allowed to lead his own witness.
THE COURT: I'm going to overrule on this question.
Next question.
BY MR. COOK:
Q. Go ahead.
Did you answer the question?
A. Yeah. That is correct. Yes.
Q. Okay.
A. That's correct.
Q. And the reason why you are requesting a restraining order -- or, a permanent restraining order against Ms. Hernandez is why?
A. Because of the harassment that my family has received.
Q. Okay.
And then, how do you attribute this specific harassment to Ms. Hernandez?

Give us three reasons why you attribute this harassment to Ms. Hernandez.
A. Because of an incident that took place on April 11th. The harassment started immediately after -- following that. The fact that we've had death threats. The fact that we've been doxxed out of every line of income that we can possibly make.
There's three reasons.
Q. Okay.
But, specifically, what are some specific actions that you can identify that Ms. Hernandez took to, I guess, you know, as you characterize it, incite you being doxxed?
Give us -- give the Court three reasons.
A. Well --
Q. What are the actions that she took?
A. She's been furthering our information on her platform. She is thanking people that are considered super spreaders on her platform. I mean, those are the reasons why I asked for some relief.
Q. I'm going to ask you --
MR. FRANKLIN-MURDOCK: Your Honor, I would move to strike the witness's answer. To the extent he's summarizing documents or written communication, the best evidence rule would require those be

introduced into evidence rather than vague summaries of them.

THE COURT: Okay. Overruled.

What's the next question, Mr. Cook?

MR. COOK: Okay.

BY MR. COOK:

Q. And Mr. Ostroushko, again, can you name something specific that Ms. Hernandez did in order to incite what you're calling doxxing?

MR. COOK: And just for the Court's clarification, docking(as spoken) meaning, you know, constant harassment, emails, calling, so on and so forth.

MR. OSTROUSHKO: She's reposted our address and our information on her own platform and thanked people for moving it for her.

Q. Okay.

A. And, specifically, my wife's job. My wife's job's address, thanking people for reaching out and attacking them to make sure that there was a positive result. What they would believe would be a positive result is a firing from my wife's job which did happen.

Q. Okay.

MR. FRANKLIN-MURDOCK: And then, Your Honor, move to strike based on the same objection as before.

THE COURT: Overruled.

BY MR. COOK:

Q. Okay. And then, you talked about your wife.

Is there anything specific with result to you or anything that you're engaged in that Ms. Hernandez, you know, took direct action?

A. Yeah. My job as well. My job. Our address at home here.

Q. Okay.

A. Our side business. We have a family side business. It's all -- we've gone from making a lot of money to nothing overnight because of this. Sorry.

MS. OSTROUSHKO: Two days.

A. Two days. Sorry. Two days.

MR. COOK: And Ms. Ostroushko, I'm going to ask you not to speak or assist Mr. Ostroushko with anything. Okay?

And, Your honor, we'll move to strike everything that Ms. Ostroushko said.

BY MR. COOK:

Q. So, specifically, you've named things that Ms. Hernandez did with respect to your -- what you're saying that she did with respect to your business, with your wife's business.

Is there anything else, anyone else, any

relative or anything else that you believe that Ms. Hernandez took action with respect to in terms of doxxing or any type of harassment?
A. Yeah. My daughter.
My daughter who goes to college. There's direct messages from Ms. Hernandez on the college's platforms asking what they're going to do to my daughter to hold her accountable for actions that did not take place at school and had nothing to do with school.
Q. Okay.
So, you named your wife, your daughter, your business, and your work.
A. My brothers, my sons. They've all had harassment from all of this.
Q. Okay.
A. Everybody in my family. I haven't talked to every single person, but I know, specifically, my two sons and their jobs. They haven't lost their jobs, but people have reached out to their jobs to get them to lose their jobs. They had nothing to do with anything. And my brothers. All my brothers and my dad.
Q. And, specifically, what did Ms. Hernandez do with respect to those family members that you named?
A. Well, they're all getting the same harassment-type

phonecalls, stuff like that.

So, I don't have specifics, but it all coincides with everything that's going on with us.

Q. Okay.

And so, let's just move on from specifics in terms of what Ms. Hernandez did. Let's talk about how you've been affected by what you attribute to Ms. Hernandez's actions.

How have you, specifically, been affected by these actions that you call doxxing and harassment?

A. Well, let's see. I specifically -- I'll just talk about myself here.

I've lost my job. I get harassed when I go out. We were receiving 40 to 50 phonecalls a day, and the phonecalls were such as: I'm going to come cut your head off, and have your dead head watch your wife and your daughter get raped.

They've threatened to come burn our house down with us in it, asking us to keep our gas on so it blows up. We've got people in the neighborhood that have flyered our neighborhood. There's other people that have been in our neighborhood and taken pictures of our house with us here.

I mean, I don't -- I guess that's what I can say to your question as far as that goes. Yeah.

Q. Okay. So, are -- okay.
Next thing I would add is in terms of financial loss, how have you suffered financially?
A. Well, I've lost my job, and we've lost the income from our side business. I mean, we're -- am I -- am I allowed to talk about specific financial loss here?
Q. Yes, you're -- you're -- go ahead.
A. Yeah. We've lost --
Q. Hold on.
Mr. Ostroushko --
A. Sure.
Q. If you could do it -- if you could state it succinctly and, you know, and briefly, please go ahead and lay it out for us.
A. We have lost over $300,000 in income over a two-day period.
Q. Okay.
And -- and you -- and -- and specifics of that income, where does the income come from?
A. My job, my wife's job, and our side business.
Q. Okay.
Also, how have you suffered, finally, I guess, emotionally? Mentally?
A. As you're -- as my attorneys, you guys know, I've been suicidal. I've not even wanted to go on because of the

stuff that we've received. It's been -- it's been insane. I -- that's -- that's the only way I can describe it. It's been totally insane.

I've never had anything like this happen in my life, and I wouldn't wish this upon anybody. No matter what political belief they have, nobody should go through this. There should be stricter laws against this stuff.

Q. Okay.

Mr. Ostroushko, do you have any evidence that you can point to which shows any type of action that Ms. Hernandez took against you to cause harassment?

A. You're asking me, or are you asking DeYanna?

I'm sorry. I thought I --

Q. No. I'm asking you, Mr. Ostroushko. We're just focused on you.

A. Okay. Please repeat -- repeat the question.

Q. Do you have any evidence, pictures, documentation, video, that demonstrates how Ms. Hernandez has taken action against you to cause you harassment?

A. Yeah. We've sent all that information to you. Yes. We have videos. We have documentation. We've extracted a lot off of her own platforms that show specifically what's going on.

Q. Okay.

MR. COOK: Your Honor, if I may, I'd like to introduce -- I'd like to bring up some exhibits, and I'd like to have Mr. Ostroushko authenticate them.

And, we'll -- I'll try to move these into evidence pretty quickly, if I may.

THE COURT: Are they already uploaded on MNDES?

MR. COOK: I believe they're already uploaded on MNDES. Yes.

THE COURT: Okay.

In which case have they been uploaded to?

MR. COOK: When you say in which case, what do you mean?

THE COURT: So, there's a court case for DeYanna, and there's a court case for Christopher, and --

MR. COOK: Well --

THE COURT: Go ahead.

MR. COOK: For Christopher.

THE COURT: Okay. That one, we do not have anything uploaded to, so we will check the other case ending in 853.

All right. What would you like to offer?

MR. COOK: The first one I'd like to offer is number 107, JPEG number 107.

THE COURT: I don't see anything labeled 107, counsel.

What are we looking for?

MR. COOK: There's a JPEG. I have it marked as 107, and it says -- you know, it has some information about Mr. Ostroushkos business called Gecko Lounge.

THE COURT: Okay.

So, I don't see this in Ms. Ostroushko -- I apologize if I'm really hurting that last name.

I don't see anything labeled 107 in that case or in -- and there aren't any uploads in Mr. Ostroushko's case.

So, maybe it's labeled differently.

MR. COOK: Yeah. It might be labeled differently. Let's just click on the first JPEG that you have in the file.

THE COURT: The first --

MR. COOK: I don't know what you're looking at, so --

THE COURT: Right.

Tell me what you want me to look at.

Let's -- let's start with that.

MR. COOK: I can't see what was uploaded to MNDES. All I see is it says Exhibit 107, underscore,

IG post. That's all I can see.
THE COURT: What's the date on the IG post?
MR. COOK: The date on -- I don't have any dates. None of my IG posts -- I don't have it so that it brings up the date.
MR. FRANKLIN-MURDOCK: Your Honor, just for the record, they're not -- they're.
THE COURT: Okay. How about --
MR. FRANKLIN-MURDOCK: They're X posts, in case that helps. Not Instagram.
THE COURT: Sorry?
MR. FRANKLIN-MURDOCK: Just in case it's helpful, Your Honor, they're -- even though they're labeled IG posts, they're actually from X, not Instagram.
THE COURT: Oh. Okay. Good to know.
I think what we'll do is we'll have -- the clerk will share their screen, and then, Mr. Cook, you can choose which of the exhibits you want me to consider.
MR. COOK: That works.
MR. FRANKLIN-MURDOCK: And, Your Honor, Mr. Cook did share these exhibits with me on the deadline. So, if Mr. Cook wants to share his screen, I have no objection.

THE COURT: Okay. Thank you.

THE CLERK: All right.

Can everyone see the MNDES screen right now?

MR. FRANKLIN-MURDOCK: Yes.

MR. COOK: Yes, Your Honor.

THE CLERK: These are the only exhibits we have uploaded in MNDES for the cases.

MR. COOK: Okay.

THE COURT: And, for record-keeping purposes, that's my clerk speaking at this moment. So --

MR. COOK: Okay. Okay.

If you could scroll down further to the -- I'm looking at -- yeah. Shapiro interview is in the middle. If you want to scroll down to the bottom.

No. No. I didn't want you to click on that one. I just wanted to see what the -- the other videos that were there at the bottom.

Am I looking at the bottom?

Can I see it from the screen?

THE CLERK: The last video is Exhibit 201, SH Video 1, April 11, 2026.

MR. COOK: Yeah. I can't see --

I guess what I'm saying is I can't see your entire screen.

THE COURT: This is -- this is what's --

MR. FRANKLIN-MURDOCK: On mine --

THE COURT: What's that?

MR. FRANKLIN-MURDOCK: I was letting counsel know that on my screen I was able to see the bottom, and it didn't make clear that this is all there is.

MR. COOK: Yeah. You know, if I could share my screen, Your Honor. You know, counsel -- I mean, if we could stipulate to that. It sounds like he was willing to stipulate to that. If we can go forward that way, that would work.

THE COURT: Stipulate to what?

MR. COOK: Allow me to share my screen. The evidence that I have.

THE COURT: Is it evidence I have, counsel?

MR. COOK: It should be the same exact evidence that you have, I believe. If I share something that it's not -- you know, I would --

THE COURT: Well, I can't -- I can't check one against the other in the moment. I have what's been uploaded to MNDES, consistent with the trial order.

MR. COOK: Okay.

THE COURT: I mean -- yeah.

MR. COOK: Understood. Understood. We'll work with what you have here. If you could -- if the

clerk could share the screen again, we'll just proceed from there.

THE COURT: Okay.

MR. COOK: That's fine.

Okay. So let me just make this bigger for me. And I'm going to try to scroll down here. And if you can go -- if you can scroll to the bottom so that -- I'm going to try to fit this to screen. Okay. If you could scroll back up to the top, Madam Clerk. If you want to click on Derek Tortenson, April 14th, IG post. Okay. If you can make that bigger. Okay.

BY MR. COOK:

Q. So, Mr. Ostroushko, have you -- have you seen this post before?

A. No, I have not. That's --

Well, only in the evidence that was shared from the defendant.

Q. Okay.

And in terms of -- what do you see here?

A. I see somebody making a post and some responses.

Q. Okay.

And this post that's here, it says: What happened was very overwhelming, but I stand firm what I stand for. No man should ever put their hands on women.

Is that something -- who do you believe posted this?

Who made this particular post?

A. I don't have any idea. Obviously, somebody that doesn't care for me too much.

Q. Okay.

And then, do you believe that this post sort of reflects, I guess, what you call doxxing towards you?

A. I mean, it could result to that, yes.

Q. Okay. Well, I'm asking you.

Do you think it does or no?

A. No. That, I don't consider doxxing. That's somebody's opinion. The stuff that we received wasn't opinions.

Q. Okay.

Any of the posts -- there's also writing on the side.

Do you see the writing on the side?

A. I do. It's really small, so I'm trying to read it.

Q. Once you take a moment to read it, do you think that any of this information here would be considered things that would be doxxing towards or harassing towards you?

A. I see a lot of opinions.

Yeah. I don't see anything like addresses, or phone numbers, anything like that. It's just a

bunch of opinions, it looks like to me.
Q. Okay.
And do you think that any of these posts or any of this information would be considered harassing, I guess, towards you?
A. Yeah. Based on what they're saying, yeah.
Q. Okay.
And do you think that this is somehow initiated or encouraged by Ms. Hernandez?
A. It could have been. I don't know.
Q. I mean, most of this -- most of this all stems from one day.
So, yes. In that aspect, yes, this would be encouraged by the person that put the information out.
So that would be Ms. Hernandez.
A. Yes.
Q. Okay.
I guess we'll mark this as Petitioner's Exhibit Number 1, Your Honor. Even though this was uploaded by respondents.
THE COURT: Okay.
Mr. Murdock, I'll guess that you don't have an objection to admission of this exhibit?
MR. FRANKLIN-MURDOCK: No objection, Your Honor.

THE COURT: All right. This will come in.
Go ahead.
MR. COOK: Yeah.
Mr. Reporter, if you could share your screen again. I want to take a look.
If you could scroll down to the bottom so that -- actually, if you stop there.
If you want to continue to scroll down to the bottom. If you stop there, just a moment.
Go ahead and continue to scroll to the bottom.
It looks like your screen is disappearing.
Okay.
Is there -- if you could scroll. I guess it looks like there's a next page -- to the next page over.
THE CLERK: There is no -- it's all on one page, so there's 25 items.
MR. COOK: Oh, this is --
So, I don't see any of the videos that we, or any of the items that we posted. I see everything --
MS. OSTROUSHKO: Could I say something?
MR. COOK: Yeah, please.
THE COURT: No. No. No. No.
We're only --

MR. COOK: Oh. I'm sorry. I thought you were someone else. I didn't know it was DeYanna.

THE COURT: -- going to hear from attorneys.

This is what we have in our portal -- in the MNDES portal.

MR. COOK: Okay. Okay.

BY MR. COOK:

Q. Mr. Ostroushko, do you see any of the images that you uploaded?

Do any of these look familiar?

A. No. Most of that -- no. It looks like mostly stuff that they've uploaded.

Q. Okay.

A. Yeah. You know, I mean -- Your Honor, I don't see any of the things that we uploaded, now that I'm looking at it -- at this really closely. I know that we did upload it. In fact, we had the law clerk on the phone, or -- you know, on the call who actually uploaded it yesterday. So --

THE COURT: Sorry.

What's that?

MR. COOK: I'm not sure where -- I'm not sure.

THE COURT: You have --

What did you say before that?

You have a law clerk -- you talked to a law clerk.

MR. COOK: The law clerk from our office who actually uploaded the information is on the call with us. Brooke Inman -- Ms. Inman.

So, I know that she uploaded it. I've seen the receipts from it.

THE COURT: Okay.

MR. COOK: But I don't see any of our information.

THE COURT: The deadline for uploading was last week, I believe. It was a week in advance.

MR. COOK: Yes.

THE COURT: Okay.

So, I just want to make sure that we're talking about all --

MR. COOK: Yes.

THE COURT: -- of the same thing.

I -- I mean, fortunately for me, they don't let me access, in any material way, any of this stuff. So, I only, you know, look at MNDES and all of that as I prepare for trial.

So, I don't --

MR. COOK: Sure.

THE COURT: I don't know what to tell you.

You can certainly try to offer things and see what counsel has to say, but we need to keep the conversation going, Mr. Cook, so that we can get to cross-exam and, you know, just -- and hearing from Ms. Ostroushko as well.

So --

MR. COOK: Right. Well, let's -- I'm going to stop with Mr. Ostroushko. I'll submit him for cross-examination, and then, you know, if there's anything else we can come back -- you know, if there's any videos -- or, I'm sorry -- any evidence, documented evidence, that we want to use, I'll come back to that during rehabilitation.

THE COURT: Okay.

Cross-exam, Mr. Murdock.

MR. FRANKLIN-MURDOCK: Thank you, Your Honor. And, I guess for purposes of efficiency, I would ask that counsel stipulate that I go beyond the scope of direct and consider this my direct examination as well, because I had planned to call Mr. Ostroushko in our case in chief as well.

MR. COOK: Yeah, I would object, because, you know -- I mean, he had a chance to cross-examine him. He might have listed him as a witness, but --

THE COURT: Mr. Murdock, I'll ask that you

cross Mr. Ostroushko now, and we can revisit anything that you don't cover later on, if necessary.

MR. FRANKLIN-MURDOCK: Okay, Your Honor. That sounds good.

C R O S S - E X A M I N A T I O N

BY MR. FRANKLIN-MURDOCK:

Q. Good afternoon, Mr. Ostroushko.

A. Good afternoon.

Q. When Mr. Cook questioned you, he showed you an Instagram post by an individual named Activist Derek that talked about how you should never put your hands on women, correct?

A. Yep. I read that.

Q. And you understood that post to be referring to you, correct?

A. Yeah.

Q. Why?

Why did you understand that to be referring to you?

A. Because that is what the harassment is based on.

Q. What is the "it" there?

A. On the post. That's what the harassment is based on, is that -- that post. Not that specific post, but an incident that happened back on April 11th.

Q. And what was that incident?

A. Mrs. Hernandez was at an event that was supposed to be a peaceful -- for -- more or less, it was a celebration, and there was a dance party, there were a lot of people having fun, and somebody noticed Ms. Hernandez in the crowd. I don't know when that was, but -- it was actually the person that wrote that message, by the way. Derek, the activist, noticed her, and was trying to get a few people engaged with her.

That's --

Q. Thank you.

MR. FRANKLIN-MURDOCK: And I would like to present our first exhibit.

Your Honor, as far as -- would I be able to share my screen and play it from the MNDES platform?

THE COURT: Yep.

MR. FRANKLIN-MURDOCK: Thank you, Your Honor.

THE COURT: You should be able to share your screen. Go ahead.

MR. FRANKLIN-MURDOCK: And is that showing now, Your Honor?

THE COURT: It is.

MR. FRANKLIN-MURDOCK: I would like to offer Exhibit 202.

THE COURT: Well, why don't you show it and ask your questions, and then you can offer it.

MR. FRANKLIN-MURDOCK: And, Your Honor, just to make sure, can you hear the video -- the audio? I know it's coming through my speaker from my computer, so I'm not sure if that's working.

But, are you able to hear it, Your Honor?

THE COURT: I am not.

MR. FRANKLIN-MURDOCK: Let me try again.

Could you hear that, Your Honor?

THE COURT: No.

I think what I'll do is -- I can access it through our MNDES.

Do you want to just --

So, let me have my clerk screen share, and we should be able to capture the --

THE CLERK: Sorry. You said Video 202?

MR. FRANKLIN-MURDOCK: Yes, Your Honor.

And, ideally, I would like to be able to ask the clerk to pause at certain points, but if I have to run it through, I can work with that.

And, Your Honor, I can't hear it on my end.

THE COURT: Nor can I, so we're working on it.

MR. FRANKLIN-MURDOCK: Okay.

MR. COOK: I can't hear it either.

THE COURT: All right. I'm going to try

to -- let's see here. Here we go. I can't hear anything.

MR. FRANKLIN-MURDOCK: Your Honor, one, kind of, alternative might be I could take my other laptop and play it and hold it up like that.

It's a little unconventional, but I can -- if I could have, maybe --

THE COURT: I've never had this problem in six years of Zoom, but, yeah, we might need to do that.

Why don't you go ahead and grab that?

MR. COOK: I would like to challenge the law to do that -- that I would be able to, you know, play from our platform as well.

MR. FRANKLIN-MURDOCK: And, Your Honor, to be clear, I was referring to logging into MNDES and playing exactly from MNDES what's there.

THE COURT: Yeah. Go ahead.

Is that the video?

THE CLERK: Yeah.

THE COURT: Oh.

THE CLERK: I think I've been able to get it to work by switching our main microphone.

Let's just try this one.

MR. FRANKLIN-MURDOCK: And I could hear that, so I think that solves the problem.

THE COURT: So, it's working. Great.

MR. FRANKLIN-MURDOCK: A lot better than me holding up a laptop.

THE COURT: But, it was a solution, so --

Okay.

(Exhibit was published.)

MR. FRANKLIN-MURDOCK: And, Madam Clerk, can you pause, please?

BY MR. FRANKLIN-MURDOCK:

Q. Mr. Ostroushko, just a few questions. I know there's a little bit of lag, but I think we got the basics.

Do you recognize this to be an event that took place on April 11, 2026 at the Whipple building in Hennepin County.

A. Yeah. That is part of that -- that was -- that did take place that day. Yes.

Q. And you recognize the individual on the left side of the screen to be Ms. Hernandez?

A. Yes, I do.

Q. Who's the individual on the right side of the screen?

A. That's my daughter.

Q. Paige Ostroushko?

A. Correct.

MR. FRANKLIN-MURDOCK: And, Madam Clerk, can you please keep playing?

(Exhibit was published.)

MR. FRANKLIN-MURDOCK: Thank you.

Your Honor, I offer this exhibit into evidence.

MR. COOK: Objection, Your Honor. Lacks foundation.

THE COURT: Overruled. It'll come in.

BY MS. OSTROUSHKO:

Q. Now, Mr. Ostroushko, that video was a little hard to see, given the lag on the Zoom, but I think you're likely familiar with it.

When you walked up to Ms. Hernandez and screamed in her ear from the back; told her to shut the F up, called her a bitch, had she assaulted you?

MR. COOK: Objection; hearsay. Also, vague, ambiguous.

THE COURT: Overruled.

MR. FRANKLIN-MURDOCK: Your Honor, I'm not offering that for the truth of the matter.

THE COURT: Overruled.

Please answer the question, sir.

MR. OSTROUSHKO: No. I never said that I was assaulted, so I'm not sure what that question has anything to do with.

BY MR. FRANKLIN-MURDOCK:
Q. When you did those things, had Ms. Hernandez assaulted your wife, DeYanna?
MR. COOK: Objection. Same thing. Mischaracterizes the video, mischaracterizes prior statements.
THE COURT: Overruled.
You can answer the question, please.
MR. OSTROUSHKO: Not that I know of. I -- I wasn't up front the whole time, so I don't know 100 percent of what was taking place. I know there was disagreement about ICE actions.
BY MR. FRANKLIN-MURDOCK:
Q. Had she assaulted your daughter, Paige?
A. Not at that moment.
Q. Had she assaulted anyone?
A. Not at that moment, I don't think.
Q. When you were yelling in her ear, were you afraid of Ms. Hernandez?
MR. COOK: Same objection.
Mischaracterizes the actual events.
THE COURT: Overruled.
You can answer the question.
MR. OSTROUSHKO: Okay. Well, I'll say this.
We've been out since January 14th, standing

up for humanity, and --

MR. FRANKLIN-MURDOCK: Your Honor, move to strike. I'm asking if he was afraid at that moment.

THE COURT: I'm not going to strike that testimony. Let's let the witness -- or -- get through the answer.

Can you --

MR. OSTROUSHKO: Okay. So --

THE COURT: Go ahead.

MR. OSTROUSHKO: Our family's been out, because this has greatly affected our family from January -- actually, the week before January 14th.

I had a viral moment on January 14th, and we were continuing to get out. And so, I've -- we've seen a number of these agitator-type folks, and we've always avoided them.

So, I've never felt afraid of any of those people at all, to answer your question, but --

I've seen all these people.

BY MR. FRANKLIN-MURDOCK:

Q. No, you were not afraid of Ms. Hernandez at that moment.

A. No.

Q. Okay.

MR. FRANKLIN-MURDOCK: Madam Clerk, can we

roll Exhibit 203, please?
(Exhibit was published.)
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, do you recognize this to be a video that was taken at the Whipple Building in Hennepin County on April 11th, 2026?
A. Yes.
Q. And we just saw your wife, DeYanna, in the video going up to Ms. Hernandez, touching her jacket, touching her -- touching her face with a dildo.
We saw that, correct?
A. I didn't see a dildo touch her face, but I did see one getting waved around in front of her face. Yes.
Q. Okay.
Savanah never blew a whistle in your ear on April 11th, correct?
A. No.
Q. She actually never blew a whistle in anyone's ear, right?
A. No. But that's what goes on at these events, so people know that's what's happening when they come to the events.
I wasn't blowing -- I wasn't blowing a whistle either, so what does that have to do with me?
I didn't blow a whistle.

Q. If Savanah had gone up -- so you think that's what happens at these events? People blow whistles --
A. Yes.
Q. Is that your estimation?
A. These people hand out printed whistles that they print at home.
Look, the event was supposed to be a celebration. That's why there were dildos there. I didn't have anything to do with the dildos, but that's why they were there. I never touched one, but they were there that day. Yeah.
Q. So, people blow whistles at protests. That's okay.
So if Savanah had gone up to you and blown a whistle in your ear, you would have been fine with that?
MR. COOK: Objection; unfair -- lacks foundation. Also unfair hypothetical.
THE COURT: Okay. I'm going to overrule because the question was speculative.
Next question, please.
BY MR. FRANKLIN-MURDOCK:
Q. And we just saw multiple people blowing whistles in Ms. Hernandez's ear in that video, correct?
A. Correct. Yeah. A lot of people are blowing whistles that day, for sure, or vuvuzelas. Those other big horn

looking things. Yeah.
Q. And, thank you for the term.
Boo-hoo --
A. Vuvuzelas. Yeah.
It's an old World Cup thing that they used to use at the World Cup. I played soccer, so I'm very familiar with that kind of stuff.
Q. And that was the red contraption that --
A. The long horn looking thing.
Q. Savanah had blowing in that video, correct?
A. Yes.
Q. Okay.
And does it look like that's uncomfortable at all for Ms. Hernandez to have all that being blown in her ear in that video?
MR. COOK: Objection, speculative.
THE COURT: Sustained.
I would like to keep us on track related to the alleged harassment so that we can really keep the narrow focus of this trial on track.
So, what's your next question, Mr. Murdock?
MR. FRANKLIN-MURDOCK: Okay, Your Honor.
Given that, I would offer -- there's one video in our exhibits that kind of show a lot of it all at once. I do think that's important context. So,

rather than going point by point through every single part of the day, perhaps we can offer that exhibit and use that as the factual basis that go into the rest.

THE COURT: Okay.

Which exhibit?

MR. COOK: I'm sorry.

Your Honor, what was that -- the last video that we saw, what was -- how was that marked?

Was that marked as Petitioner's Number 2 or what?

THE COURT: It's 203.

MR. FRANKLIN-MURDOCK: Your Honor, I would offer 203 in that event.

THE COURT: 203 is in.

What is the next exhibit, counsel?

MR. FRANKLIN-MURDOCK: 205, Your Honor.

THE COURT: Okay.

(Exhibit was published.)

MR. FRANKLIN-MURDOCK: And can we pause, Madam Clerk, please?

BY MR. FRANKLIN-MURDOCK:

Q. Before this happened, Mr. Ostroushko, isn't it true that you told your daughter to get a whistle and to, quote, blow it in her f-ing ear?

MR. COOK: Objection; lacks foundation.

THE COURT: Sustained.
MR. FRANKLIN-MURDOCK: Your Honor, before this -- do you --
Sorry, not Your Honor.
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, do you recognize this video?
A. Yeah. It happened that day.
Q. And do you recall your daughter, Paige Ostroushko, blowing whistles in Ms. Hernandez's ear?
A. I recall her blowing whistles a lot that day. Yeah.
Q. At any point that day, had you told your daughter to blow a whistle in her f-ing ear?
MR. COOK: Same objection; lacks foundation.
THE COURT: I'm -- overruled on foundation.
MR. OSTROUSHKO: So, can you repeat the question?
Am I supposed to answer that?
BY MR. FRANKLIN-MURDOCK:
Q. At any point that day, Mr. Ostroushko, had you told your daughter, Paige Ostroushko, to blow a whistle in Mr. Hernandez's, quote, f-ing ear?
MR. FRANKLIN-MURDOCK: And I'm not going to swear, Your Honor, but that's --
THE COURT: Thank you.
MR. FRANKLIN-MURDOCK: You know what the word

is.

MR. OSTROUSHKO: Can I talk about the context of what that conversation actually was?

THE COURT: No. You're --

MR. OSTROUSHKO: Because the way --

THE COURT: Hang on.

MR. FRANKLIN-MURDOCK: Your attorney will have an opportunity to question you.

THE COURT: Hang on. Stop. Stop.

Mr. Ostroushko, Mr. Murdock is asking you yes and no questions. Mr. Cook will follow up and get more context from you. So, just answer Mr. Murdock's questions, and the follow up will come during what's called your redirect.

Okay?

MR. OSTROUSHKO: Okay. Yes. I did tell her to do that instead of something else. Yes.

MR. FRANKLIN-MURDOCK: Okay.

Madam Clerk, can we see the rest of the video?

(Exhibit was published.)

Please pause, Madam Clerk.

BY MR. FRANKLIN-MURDOCK:

Q. Mr. Ostroushko, that was you, correct?

A. Yeah. That was me.

Q. And when I asked you earlier what happened on April 11th, you didn't mention that you had shoved Ms. Hernandez right into the ground from the back unprovoked, did you?
A. It was provoked, because she actually assaulted my daughter and my wife before that. And I witnessed that happening.
And I will say this as well. This -- my harassment order has nothing to do with this. It has to do with the actions that have taken place after April 11th.
So, I'm not sure why any of this is admissible at all, because --
Q. Well, that's for the Court to determine.
A. Yeah. Well --
MR. FRANKLIN-MURDOCK: Madam Clerk, can we see the rest of the video, please?
(Exhibit was published.)
MR. FRANKLIN-MURDOCK: Madam Clerk, I think that's enough for this video.
BY MR. FRANKLIN-MURDOCK:
Q. Now, Mr. Ostroushko, do you have any reason to think that what we saw in that video is not what actually took place on April 11th?
A. No. That all took place, but I see stuff that's not in

there that actually took place as well. So --
Q. But everything in the video is correct?
A. I'm sorry. What?
Q. Everything in the video is correct. It's not an AI video. It's not edited. Nothing like that.
A. I believe it's correct. Yeah.
MR. FRANKLIN-MURDOCK: Your Honor, I would offer that exhibit into evidence.
MR. COOK: I'd object based on relevance.
THE COURT: Overruled. I will let it in. Let me just -- what is that? 205? No.
THE CLERK: Yes.
THE COURT: Oh. Okay. 205.
MR. FRANKLIN-MURDOCK: 205.
THE COURT: All right, go ahead, Mr. Murdock.
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, you've been indicted by a federal grand jury on a felony charge for what you did on April 11th, correct?
MR. COOK: Objection; relevance.
THE COURT: Sustained.
Next question.
MR. FRANKLIN-MURDOCK: Your Honor -- I'm sorry.

BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, do you have any reason to believe that Ms. Hernandez is facing any criminal charges related to anything that she's done on April 11th or thereafter?
MR. COOK: Objection; calls for legal opinion.
THE COURT: Overruled.
You can answer that if you know it.
MR. OSTROUSHKO: Actually, I don't know because there is an investigation taking place. I don't know what the answer is to that. I don't have a correct answer for that.
THE COURT: All right.
MR. FRANKLIN-MURDOCK: And, Your Honor, if I may make an offer of proof as to the criminal charges. In this proceeding, Mr. Ostroushko is seeking a stay-away order relating to Ms. Hernandez, and I would like to submit evidence that Mr. Ostroushko is actually facing conditions in one of the cases that he's been charged in -- one of the two -- that do bear on whether there's any need for a stay-away order in this case.
MR. COOK: Objection.
Your Honor, I'd object for a number of reasons.
Number one, relevance. Two, it's unfairly

prejudicial. Three, they're charges. He's facing charges right now. He hasn't been convicted of anything. It is completely irrelevant to this particular proceeding.

He's asking for a stay-away order from -- or, you know, for a harassment order from Ms. Hernandez.

THE COURT: I -- yeah. I find that this is not going to be of significant relevance to this particular discussion, Mr. Murdock. I understand that it's out there, and -- but I -- I just don't -- I don't think it's going to be helpful on this narrow topic.

MR. FRANKLIN-MURDOCK: That's fine, Your Honor. I'll move on.

BY MR. FRANKLIN-MURDOCK:

Q. Mr. Ostroushko, you filed your restraining order in this case on May 13, 2026; is that correct?

A. Yes.

Q. And you had said earlier that -- I think you said that you had lost $300,000 -- you and your family had lost $300,000 of income in two days, correct?

A. Correct.

Q. But you waited until May 13th to seek a restraining order?

A. Based on legal representation, yes. They told me to wait.

Q. I don't want to hear what your counsel told you.
A. Well, I'm just giving you the answer.
Q. Okay. That's fine.
And, as of May 13th, Ms. Hernandez had already filed a civil lawsuit against you in federal court, correct?
A. I don't know when that was filed. I don't have the paperwork in front of me.
Q. Okay. But you --
And that was after you had been indicted?
A. Yeah.
MR. COOK: Objection; lacks foundation. Also, relevant.
THE COURT: Overruled.
Let's move on.
Mr. Murdock?
BY MR. FRANKLIN-MURDOCK:
Q. And you signed -- do you recall filling out a petition for a restraining order in this case?
A. Yes.
MR. COOK: Objections; asked and -- Okay. Well --
BY MR. FRANKLIN-MURDOCK:
Q. Those were your words that you put on there?
A. Yeah.

Q. You read it before you signed it?
A. Correct.
Q. You signed it?
A. Yes.
Q. You signed it under oath, correct?
A. Yeah.
Q. Under penalty of perjury?
A. Yes.
Q. So you understand that, if later on, a prosecutor or a jury determines that you intentionally lied, you could be facing additional criminal charges, correct?
A. Yes.
Q. Okay.

And I'm going to read from your restraining order. I won't publish it onto the screen, but if you want me to show it to you, happy to do that. I'm just going to read you verbatim what you wrote.

You wrote: Respondent initiated or actively encouraged a coordinated doxxing and smear campaign against me and my family. As part of that campaign, Respondent and her followers posted and circulated our private information, including our home address, phone numbers, places of employment, our family business, and other identifying details.

Are those your words, Mr. Ostroushko?

A. That's exactly what happened.
Q. And isn't it true that Savanah Hernandez never posted your home address online?
A. She reposted it online on her own platform. We pulled it off of there.
Q. Mr. Ostroushko, I've looked at all of your exhibits. We don't have them here, unfortunately, but you know that's not true, don't you? That she never posted your address, reposted it, anything like that.
THE COURT: Counsel --
MR. COOK: Objection; argumentative. Also, harassing the witness.
THE COURT: Okay. It is argumentative. It's also been asked and answered, if it's not harassing the witness.
What's your next question, Mr. Murdock?
BY MR. FRANKLIN-MURDOCK:
Q. Do you have any evidence to suggest that Ms. Hernandez ever told anyone else to post your home address?
MR. COOK: Same objection.
THE COURT: Can you ask the question again?
MR. FRANKLIN-MURDOCK: I'll rephrase, Your Honor.
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, is there any reason that you have in

your mind to think that Ms. Hernandez told anyone else to post your home address on the internet?

THE COURT: I'm going to overrule any objection to that question.

Do you have an answer to that, sir?

MR. OSTROUSHKO: Yeah, because we have so much -- look, we've been going through hell for the last -- I don't know, since this all happened. And I can't sit here and pull exact information out of my brain. I have to have it in front of me, but I know for a fact that we have been doxxed. These -- we have lost our jobs. We have lost literally everything, and none of that happened before what happened with Ms. Hernandez.

So, she is a direct influence as to what happened.

BY MR. FRANKLIN-MURDOCK:

Q. Ms. Hernandez never posted your phone number on the internet, correct?

MR. COOK: Asked and answered. Objection, Your Honor. Asked and answered.

THE COURT: Sustained.

MR. FRANKLIN-MURDOCK: Your Honor, I asked about her address. Now I'm asking about her phone number.

THE COURT: Okay.

MR. OSTROUSHKO: I have seen it reposted on the internet. Yes.

THE COURT: Okay.

BY MR. FRANKLIN-MURDOCK:

Q. Mr. Ostroushko, I'm not asking if you've seen it reposted. I'm asking if Ms. Hernandez has posted your phone number on the internet.

A. I can't --

MR. COOK: Same objection. Asked and answered.

MR. OSTROUSHKO: I'm sorry.

MR. COOK: Hold on, Mr. Ostroushko.

Ask an answered, Your Honor.

THE COURT: It has not been asked and answered. Specifically related to the telephone number, it has not.

So, Mr. Ostroushko, if you could answer that. I think you might have started to, and then we all interrupted you.

MR. OSTROUSHKO: I've seen it posted and reposted so many times. I don't know off the top of my head, without actually having the information in front of my face, who reposted it, what it was reposted. I don't have all that information in front of me at the

moment, but I have seen it. I've seen it reposted.
Like I say, we were receiving 40 to 50 threatening phone calls a day, so it was -- it's out there.
BY MR. FRANKLIN-MURDOCK:
Q. And do you have any reason, as you sit here today, to think that Ms. Hernandez told anyone to post your phone number on the internet?
A. Do I believe that she did that?
Q. Do you have any reason to believe that?
A. I do have a reason to believe that. Yes.
Q. Go ahead and --
A. What?
MR. COOK: Calls for a narrative.
THE COURT: Sustained.
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, what reason do you have to believe that Ms. Hernandez told someone else to post your phone number to the internet?
A. What reason do I have to believe?
Is that the question? What reason do I have to believe that?
Q. Yes.
A. Well, we have been doxxed out of everything; and we were receiving all the phone calls; and it was all

directly related to the incident that happened that day; and she's the one that posted it online.
Q. When you say she's the one that posted it online, what's the it there? Your phone number or something else?
A. Video, address, phone number, asking people to doxx us. She's literally saying that on her platform.
Q. So your testimony today, under oath, under penalty of perjury, is that Ms. Hernandez posted your address and phone number on the internet?
A. What I'm saying is that she furthered the doxxing.
Q. I'm not asking about furthering. I'm asking you whether she posted your address --
A. That's my answer.
Q. -- and phone number on the internet. It's a simple question.
A. That's my answer. She --
THE COURT: Okay.
The question has been asked and answered. I think this is as far as we can go on that question.
What's your next question, Mr. Murdock?
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, when Mr. Cook was asking you questions, you described some pretty terrible things that other people have done; death threats, put flyers in your

neighborhood, people calling and saying terrible things about your family.

Correct?

A. Correct.

Q. How many of those people have you sought restraining orders against?

A. See, this is -- you're asking me questions about things that are actually underway, and I can't really give you direct answers for that. We do -- we have turned over all of that information to our local police department, and they have investigations underway. They can't tell us which ones they're investigating and which ones they aren't. We've pushed to have them all investigated, but I don't control that, and they can't give us that information --

THE COURT: Okay.

A. -- until there's conviction.

THE COURT: All right.

BY MR. FRANKLIN-MURDOCK:

Q. Mr. Ostroushko, I didn't ask about that.

MR. COOK: Your Honor, I was also trying to object based on relevance. I mean, is it relevant to whether or not he's should -- he's entitled to a restraining order against Ms. Hernandez?

THE COURT: Okay. We're going to move on to

the next question.
MR. FRANKLIN-MURDOCK: Your Honor --
THE COURT: That's the answer that you have received -- we have received.
Go ahead, Mr. Murdock.
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, are you familiar with someone who runs an Instagram account named oak__a__yinzer?
MR. COOK: Objection; lacks foundation. Also, relevance.
THE COURT: Sustained.
MR. FRANKLIN-MURDOCK: Your Honor, I'm going to publish an exhibit, and I'd like to ask Mr. Ostroushko some questions about it.
THE COURT: Which exhibit?
MR. FRANKLIN-MURDOCK: I'm -- it will be 214.
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, do you recognize this to be an Instagram post?
A. Yeah. It's an Instagram post. Yeah.
Q. And the Instagram post contains a screen shot of what looks like a text message conversation; is that correct?
A. Yeah.
Q. And do you see that head on the left that appears twice

on the left side of the screen?
A. Yep.
Q. Is that your picture?
A. Yeah. It's the angry man picture. Yeah.
Q. Are these messages that you sent an individual?
A. Yes.
Q. And you wrote to an individual: Because of this video, my family and I have been doxxed and are receiving threats. Even if it shows the truth, they are picking it apart and using it to come after my family and I.
Do you see that?
A. I do see that. Yes.
Q. And do you recall sending those text messages?
A. I do, but it's for two separate incidences.
Q. And, just to be clear, I'm not asking you about the top message. I'm just asking about the one that starts at 8:19.
A. Yeah. That's referring to two separate incidences that have to do with ope_a_yinzer, who is also another person. It's Adam Beers(as spoken) is his real name. Mm-hmm.
Q. Okay. And, Mr. Beers responded that you beat up an f-ing woman; is that correct?
A. Yeah. That's what he says there. Yes.
MR. COOK: And, Your Honor, I'm going to

object to this. This is irrelevant. This is irrelevant, Your Honor. I'm not actually -- you know --

THE COURT: Okay. I'm going to overrule the objection.

What's the question, Mr. Murdock?

BY MR. FRANKLIN-MURDOCK:

Q. When Mr. Beers wrote, you beat up an f-ing woman, do you understand that to be referring to Ms. Hernandez?

MR. COOK: Objection; calls for speculation.

THE COURT: Overruled.

Answer the question if you can, Mr. Ostroushko.

MR. OSTROUSHKO: I mean, I think so. The bottom half of his message has nothing to do with what happened on that day. It has to do with the fact that we were already in a -- he was already trying to do some other things to make me look bad, which had nothing to do with any aggression whatsoever. It had to do with some PPE protection that was sent here from Illinois that he was involved with, and we just accepted it and handed it out. So --

That's the whole thing. A lot of this isn't everything that you're trying to make it out to be. It's separate incidences we're dealing with that person with.

Q. Okay.
And, Mr. Ostroushko, when you wrote "because of this video, my family and I have been doxxed and are receiving threats," what video are you referring to?
A. That particular part is referring to the video.
Q. And, when you say "the video," do you mean the video of what you did on April 11th?
A. Well, it's the video of --
MR. COOK: Objection; vague. Ambiguous.
THE COURT: Overruled.
MR. OSTROUSHKO: Should be -- yeah. It was the number of videos that -- from people recording it.
BY MR. FRANKLIN-MURDOCK:
Q. And, so is it your understanding that people doxxed you and threatened you because of what they saw on videos that other people had published online of what you did on April 11th?
MR. COOK: Objection; calls for speculation.
THE COURT: Overruled.
MR. OSTROUSHKO: Okay. Most of those videos were not posted yet. There was one particular video that was posted, which you haven't shared. It's a video that your client posted that was highly edited. We actually have that video. I don't think we have that as evidence, because it has nothing to do with

this case, really, but it was due to that particular video. And, Adam was trying to further that video.
BY MR. FRANKLIN-MURDOCK:
Q. What did Adam do to further that video?
THE COURT: Okay. That is beyond the scope of --
A. From taking it from your client and reposting it.
THE COURT: Okay.
Mr. Murdock, let's stay on topic. We still have Ms. Ostroushko's testimony, and we're -- I want to keep us on track.
MR. FRANKLIN-MURDOCK: I think I can go to the next thing. I have a lot more, but I can do it very quickly, so I'll condense it.
I'd offer this exhibit into evidence, Your Honor.
MR. COOK: I object. It's not relevant, Your Honor.
THE COURT: Overruled. It'll come in. It is 214. It's admitted.
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, on April 15th of this year, you and your wife DeYanna and one of your lawyers, Ms. Pohland, went on a YouTube show entitled Pushing the Limits with Brian Shapiro; is that correct?

A. Yes, we did.

MR. FRANKLIN-MURDOCK: And, Your Honor, to your point about time, I'm not going to play the video unless Mr. Ostroushko contradicts what he said in it. So, I'll try to do this as fast as I can.

BY MR. FRANKLIN-MURDOCK:

Q. On this video, you said that all you wanted was for Ms. Hernandez to leave you alone so this whole thing would stop; is that correct?

A. Correct.

Q. And when you went on that YouTube show, you were aware that the incident on April 11th was attracting quite a bit of attention online and in the media, correct?

A. Yeah. Yes, it was.

Q. But by giving an interview about that incident with your wife and your lawyer, you were actually adding more attention to that incident, weren't you?

MR. COOK: Objection; calls for speculation. Also assumes facts.

THE COURT: It does call for speculation. It does.

MR. FRANKLIN-MURDOCK: I can rephrase, Your Honor.

THE COURT: Okay.

BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, when you decided to go on that YouTube show with your wife and your lawyer, did you think that, by appearing on the show, you might be adding fuel to the fire and attracting more attention to the incident?
MR. COOK: Again, objection; vague, ambiguous, and assumes facts.
THE COURT: Overruled.
You can answer that if you're able to, Mr. Ostroushko.
MR. OSTROUSHKO: Can you please repeat the question?
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, when you decided to go on the Pushing the Limits show on April 15th with your wife and your lawyer, did you think that you might be adding fuel to the fire and making -- adding more attention to this incident by going and giving an interview about it?
MR. COOK: Objection; calls for speculation.
THE COURT: Overruled.
MR. OSTROUSHKO: No. Simple answer is no.
THE COURT: Okay.
BY MR. FRANKLIN-MURDOCK:
Q. Sure. And you believe that you had the First Amendment

right to go on a new show and talk about what happened that day, correct?
A. Yes.
Q. And on April 20th of this year, you and your wife DeYanna went on Primetime with David Pollack on One America News Network, correct?
A. Yes.
Q. And that's a national news program?
A. I think so. I don't know anything about it. I don't know.
Q. Okay. But, it's a news show?
A. It's a news show. Yeah.
Q. And One America News is a left-leaning or right-leaning news show?
A. Very light -- very, very right --
MR. COOK: Objection; calls for speculation.
THE COURT: Overruled on speculation --
MR. COOK: And also relevance.
THE COURT: Sustained on relevance.
MR. FRANKLIN-MURDOCK: Fair enough, Your Honor.
BY MR. FRANKLIN-MURDOCK:
Q. Do you recall what -- your interview on One America News?
THE COURT: How is this --

A. No. All this stuff was so long ago, I don't -- if I watch it, I'll recall it, but I don't -- no. There's so much going on in our lives. I don't -- no.
Q. If I tell you -- and you can -- if you don't remember, that's fine. We can play the video. I'm just trying to save time.
You said in the video that people made a lot of phonecalls, sent a lot of text messages, and contacted your friends, family, and neighbors -- and I'm paraphrasing.
That's -- that's what you talked about on that One -- OAN?
A. Essentially, yes. Yes. Essentially, yes.
Q. And you did not say on your OAN appearance that Ms. Hernandez did any of those things, did you?
MR. COOK: Objection; calls for --
MR. FRANKLIN-MURDOCK: We can play the video if you want.
MR. COOK: I'll withdraw my objection.
THE COURT: Well, I didn't hear the question.
BY MR. FRANKLIN-MURDOCK:
Q. Mr. Ostroushko, when you went on One America News and talked about people making phonecalls, sending text messages, and contacting your friends, family, and neighbors -- you didn't say on OAN that Ms. Hernandez

had done any of those things, correct?

A. At the advice of my counsel, I was not supposed to talk about Ms. Hernandez directly.

That's one thing I'd like to bring up. Like -- you know.

THE COURT: Actually, you answered the question, sir --

MR. OSTROUSHKO: Okay.

THE COURT: -- and we have to move on to the next question.

MR. OSTROUSHKO: Okay.

MR. FRANKLIN-MURDOCK: And this one I will play, because I think it's important, Your Honor.

And, I'll just ask a set-up question first.

BY MR. FRANKLIN-MURDOCK:

Q. On April 20th, you posted a video on Instagram with your wife, DeYanna, your daughter, Paige, your lawyers, James Cook, and Trisha Pohland, and other community members, correct?

A. Yes, we did.

Q. Can we please play Exhibit 212?

(Exhibit was published.)

MR. FRANKLIN-MURDOCK: And, Your Honor, in the interest of time, I think we can pause.

BY MR. FRANKLIN-MURDOCK:
Q. Is this the Instagram video you posted on April 20th?
A. Yep. We posted that.
MR. FRANKLIN-MURDOCK: And I'd offer this exhibit as evidence, Your Honor.
MR. COOK: Objection. Objection based on relevance.
MR. FRANKLIN-MURDOCK: Overruled. 212 will come in.
BY MR. FRANKLIN-MURDOCK:
Q. And I know the audio was kind of hard to hear, but we did have the captions.
You said that you felt really contrite in that video, correct?
A. Yes. That's what I said.
Q. What were you contrite about?
A. The whole -- at -- just everything that happened that day -- on the 11th.
Q. Were you contrite about shoving Ms. Hernandez from the back into the ground?
A. The whole situation.
Q. Does that include shoving Ms. Hernandez from the back into the ground?
A. The whole situation.
MR. COOK: Objection; asked and answered.

THE COURT: Asked and answered.
What's your next question, Mr. Murdock?
BY MR. FRANKLIN-MURDOCK:
Q. This video was posted nine days after the incident, correct?
A. I think so. I don't have that -- like I said, I don't have the stuff in front of me, so I don't -- I can't give you an exact date.
But, yeah, something like that. Yeah.
Q. And we can play the whole video if we need to, but you didn't say anywhere in that video that Ms. Hernandez doxxed you, did you?
A. Again, I'm not allowed to talk about Ms. Hernandez. I took the advice of my counsel, whereas obviously the other side did not.
So, whenever I've had an illegal situation, I take the advice of counsel. If they tell me not to talk about somebody or something in particular, I listen.
Q. I'm not asking for the reason. I'm asking you to confirm that you did not say that Ms. Hernandez doxxed you in that video, correct?
MR. COOK: Objection; asked and answered.
THE COURT: It's -- the question has been asked and answered.

MR. OSTROUSHKO: I wasn't allowed to talk about --

THE COURT: The question has been asked and answered. The video speaks for itself.

What's the next question, Mr. Murdock?

BY MR. FRANKLIN-MURDOCK:

Q. And you also did not -- just for the record, you also did not say in that video that Ms. Hernandez harassed you, correct?

A. Wasn't allowed to talk about Ms. Hernandez at all.

Q. Okay.

A. It doesn't mean that that's not what was happening --

THE COURT: Okay. Wait. There's no question in front of you, sir?

A. -- I just couldn't talk --

MR. COOK: Move to strike, Your Honor. Move to strike.

BY MR. FRANKLIN-MURDOCK:

Q. Earlier, Mr. Ostroushko, we looked at an Instagram post from Derrick Torstensen -- activist Derrick.

Do you remember that?

A. Yeah. Yep.

Q. Okay.

Can we please look at exhibit 217?

Do you recognize this to be an Instagram post

from an individual named Trisha Pohland?
A. I do. Yeah.
Q. And Trisha Pohland is one of your lawyers who's present today, correct?
A. Yes, she is.
Q. And you also -- do you recognize Mr. Cook and Ms. Pohland in the picture?
A. Yes.
Q. And you're in the picture too, right?
A. Yeah. I'm in the back there. Yep.
Always in the back.
Q. Yep.
And do you see a comment on the right side of the screen from ope_a_yinzer?
A. I can't read any of it. I'm sorry. I don't have that great of eyesight anymore. Getting old.
MR. COOK: And, Your Honor, I'd object to his -- relevance, if he's going to ask about someone else's comments on the post.
THE COURT: Yeah.
Mr. Murdock, can you explain how this is a relevant --
MR. FRANKLIN-MURDOCK: Sure. I -- if I could ask --
THE COURT: -- way to get me information?

MR. FRANKLIN-MURDOCK: Absolutely.

Madam Clerk, please scroll down just a little bit. The comment I want to zero in on is cut off.

Perfect. Thank you.

Your Honor, I guess as an offer of proof, I want to show that Mr. Ostroushko is engaging in conduct that -- while he blames Ms. Hernandez for every bad thing that's happened to him since April 11th, I want the Court to show that to the extent that bad things have happened to him, he is engaged in conduct that has had its own consequences.

MR. COOK: Your Honor, I'd object. That's a leap. I'd object as -- based on relevance. I mean, it's compound. He's assuming facts. Also calls for a narrative.

THE COURT: Yeah. I don't want to get --

MR. FRANKLIN-MURDOCK: I think the only question, Your Honor, is whether he recognizes --

THE COURT: Hold -- stop.

So, I don't think this is a helpful way for me to learn about the alleged harassment or its effects, if that's in fact what we're discussing today. This is getting pretty far into the weeds of Instagram comments, which is not going to be a helpful way for me to make a legal decision.

MR. FRANKLIN-MURDOCK: Okay. Understood, Your Honor, and just a couple more questions.

BY MR. FRANKLIN-MURDOCK:

Q. Mr. Ostroushko, is it your testimony that Ms. Hernandez posted -- not your business, the Gecko Lounge, but your employer, at any point, on the internet?

MR. COOK: Objection; asked and answered.

THE COURT: Sustained.

MR. FRANKLIN-MURDOCK: Your Honor, I've only asked about phone number and address so far. I've not asked about employers.

THE COURT: Oh. Okay.

MR. COOK: You did earlier.

THE COURT: I'll overrule the objection.

You can answer that question, Mr. Ostroushko.

MR. OSTROUSHKO: Yeah. I don't know.

Like I say, I don't have all that stuff in front of me, at the moment, so I can't verify that specifically. No.

BY MR. FRANKLIN-MURDOCK:

Q. And, Mr. Ostroushko, last few questions.

You mentioned that other family members of yours have received harassment too.

A. Correct.

Q. Does that include your daughter, Desiree?

A. I don't know about Desiree. We don't talk very often, so I don't know. I can't --

Q. Desiree actually posted a message on the internet supporting Ms. Hernandez, correct?

MR. COOK: Objection; relevance, Your Honor.

THE COURT: Overruled. That's not relevant.

MR. COOK: You mean sustained, Your Honor?

THE COURT: Oh, I'm sorry. Sustained. That's not relevant. I apologize. It's been a long day.

Continue, Mr. Murdock.

MR. FRANKLIN-MURDOCK: And I'll leave it there, Your Honor. I think -- I know we have a lot left to do today, so --

THE COURT: We do.

MR. FRANKLIN-MURDOCK: I had a lot more, and I'll show the court that I did condense it if --

THE COURT: I'm sure you did. Thank you.

Mr. Cook, very briefly on redirect, because we do have to move to Ms. Ostroushko's case.

MR. COOK: Exhibit 205. Or, let's start with Exhibit 203. I'll just talk about it.

R E D I R E C T E X A M I N A T I O N

BY MR. COOK:

Q. You remember at the end of Exhibit 203, Mr.

Ostroushko -- did you see Ms. Hernandez shove Paige in the face?
Do you remember seeing that?
A. I did.
Q. Okay.
And do you remember Exhibit 205 -- at the beginning of Exhibit 205, did you see Ms. Hernandez shove Paige in the face twice?
A. I did.
Q. Okay.
Also, you had -- you were shown -- you were read copies of the restraining order. You were read some verbiage from the restraining order.
Do you remember that?
A. Yes.
Q. Okay.
And based on the comments that were read from the restraining order, is it still your position that Ms. Hernandez, in different ways, either directly or indirectly, influenced you being harassed and doxxed by the members of the public or members of the specific political group?
MR. FRANKLIN-MURDOCK: Objection; vague and ambiguous as to directly.
THE COURT: Yeah. I -- sustained.

You're going to need either break that down, Mr. Cook, or -- well, just break down each question that you're asking in there.

MR. COOK: No problem. Yeah. I'll strike it, Your Honor.

BY MR. COOK:

Q. So, based on what was read to you off of the restraining order -- do you remember that, Mr. Ostroushko?

A. I do.

Q. Do you -- based on what you heard and what was read to you, do you believe that, based on those words, that Ms. Hernandez directly initiated doxxing and harassment by third parties?

A. Yes.

Q. Do you -- also in the same line of questioning, do you believe that she, indirectly, by her actions, initiated doxxing and harassment by third parties?

A. Yes.

Q. Okay.

In Exhibit 212, you were shown -- you were asked about some comments that you made when you were, I guess, at Whipple with myself, and you were asked about the word contrite.

Do you remember that?

A. I -- yes, I was.
Q. Okay.
Exactly -- when you say that you're contrite -- he also asked you about rolling back the clock -- can you just clarify, I guess, what you meant?
A. I meant that I wish that -- if we had to do it all over again, that things would have been handled a little differently. That's what I mean.
Q. Okay.
Also, in the same video that you were shown, both 203 and 205, you remember that there was some back and forth with mister -- I'm sorry -- with Ms. Hernandez; is that correct?
A. Yes.
Q. Okay.
Do you remember anything specifically that she said that was offensive or harassing towards your daughter?
A. I don't -- without watching the videos and listening again, I can't specifically state that, to be honest. I know that it was not in favor of what we were standing up for. I can say that.
Q. Do you remember anything that she said that was specifically harassing towards your wife?
A. Well, I mean, there was a conversation brought up about

rape, and my daughter and wife both happen to be rape victims, so that was -- I do remember that.

Q. Okay.

And, specifically, what did she say?

MR. FRANKLIN-MURDOCK: Objection, Your Honor. The video speaks for itself.

MR. COOK: Well, honestly, it doesn't, Your Honor. You can barely hear it, and you couldn't really see even the captions that were -- you know, that -- that reflected what was speaking. So, that's why I'm trying to --

THE COURT: Why don't we -- why don't we ask Mr. Ostroushko what he understood to have been said, and if you need to play the video again you can do that.

MR. COOK: Go ahead, Mr. Ostroushko.

MR. OSTROUSHKO: Well, some of the verbiage that was said that day wasn't actually on that specific video, and I'm not sure if it was on some of the other ones. I believe there is a video out there that says -- but she didn't seem to care that there were immigrants getting raped in the detention centers, because they're illegal and they shouldn't be here anyway, so they're already breaking the law.

BY MR. COOK:
Q. Okay.
MR. FRANKLIN-MURDOCK: Objection, Your Honor. Again, if counsel wants to play the video, he can play the video instead of --
THE COURT: It's noted.
And anything else?
MR. COOK: No further questions for Mr. Ostroushko.
THE COURT: Do you have recross, Mr. Murdock, or can we move on to Ms. Ostroushko?
MR. FRANKLIN-MURDOCK: No recross, Your Honor.
Just a question on, kind of, housekeeping mechanics.
Since there's two cases, I would ask that Your Honor enter judgment as a matter of law in favor of the respondent as to Mr. Ostroushko's case. He hasn't met his burden. I can offer arguments as to why. If we do Mr. Ostroushko and then Ms. Hernandez, the scope of Ms. Hernandez's direct will be much longer, because I'll have to go into everything.
So, I think, given that Mr. Ostroushko has presented his case, and that Ms. Ostroushko is going to present evidence in support of his petition, I would

ask for directed verdict -- or judgment as a matter of law, rather, as to Mr. Ostroushko's case.

THE COURT: Okay. I'm --

MR. COOK: The petitioner doesn't think it -- oh, go ahead. Sorry. Sorry, Your Honor.

THE COURT: Well, you can respond.

MR. COOK: I mean, yeah. The petitioner thinks that there are factual questions of fact that can still be litigated, and we would object to it. Or, I guess we don't think that the respondent is entitled to a directed verdict, at this point, because Mr. Ostroushko has definitely talked about numerous situations --

THE COURT: Okay.

MR. COOK: -- whether it relates to the petitioner's evidence or our evidence.

THE COURT: All right. I'm going to take Mr. Ostroushko's harassment restraining order under advisement, but we are going to conclude his portion. I'll remind everyone that we have until 4:30, so we need to keep moving forward.

So, Mr. Cook, are you prepared to inquire of your client, Ms. Ostroushko?

MR. COOK: Yes.

THE COURT: Okay.

DEYANNA OSTROUSHKO,
The witness in the above entitled
matter after having been duly sworn
testifies and says as follows:

D I R E C T E X A M I N A T I O N

BY MR. COOK:
Q. Ms. Ostroushko, I'm going to proceed with the -- forget about the preliminaries. I mean, you understand why you're here today; is that correct?
A. I do.
Q. Okay. And then, you're here today because you want to get a restraining -- a permanent restraining order against Ms. Savanah Hernandez; is that correct?
A. Yes, that's correct.
Q. And can you just briefly tell the Court why?
Can you give her, like, say, three, four reasons? State them, you know, succinct as you can, and as briefly as you can, as to why you want a restraining order against Ms. Hernandez.
A. Because, one, she physically assaulted me at the Whipple Federal Building by grabbing my neck.
Two, she posted my employer online on her page. She posted our Gecko business. She posted our pictures all over her page for third parties to comment -- to start a -- to start a doxxing campaign,

where the comments, the people are, you know, putting our address. They literally say go after my employer. They're posting my CEO's picture. I contacted my employer to let them know what was going on, and they were concerned about me with the death threats. And then, the next day, after my husband was let go, a few hours later, I was let go because of a one-sided edited video that was sent to my employer.

And, for days, they were getting harassed and harassed to the point of -- they were also receiving death threats. They have posted -- they would not tell me the reason I was -- I was terminated, but they posted it. They tried to send private messages to the third parties that are connected to Savanah on the internet, and to demand that of my firing. And my company thought they'd be smart to send them private messages saying I was terminated -- I was terminated. And then, those third parties connected to Savanah exposed them saying I was violent and I was for harassment.

So, they -- they were literally getting attacked by all of these people on X, connected and replied to Savanah, for the demand of my termination. And I was defending and protecting my daughter after she was -- her face was grabbed by Savanah.

I went up to her. I tried to deescalate the situation. I went up to her and said: Don't f-ing touch my daughter.

And she approached me and grabbed my neck.

Q. Okay.

And then, in -- there are -- I guess when we've -- actually let me just strike all that.

Are there any other reasons why you believe that you need a restraining order against Ms. Hernandez?

A. Because of the -- because of the -- the doxxing. Every time she does something -- every time she posts our name all over the internet. We know her every move based on what she does. She knows indictment charges are coming to our family. We don't even know anything, but yet we have FBI showing up at our front door. We have -- every time she posts about us, the doxxing starts again with all of her followers.

And then -- and then she has a -- then she has a -- the -- sorry.

Then, we try to protect ourselves with -- with the restraining orders against her, and then she takes the restraining orders online to talk about everything in them.

Like, where is our protection?

Q. So have you -- did you actually see her reference your restraining order online?
A. Yes.
And then after --
Q. Hold on. You got to -- you got to listen to my questions, if you could.
A. Yes. Yes.
Q. And when -- when she did this, can you just describe exactly what she did?
A. She created a video --
MR. FRANKLIN-MURDOCK: Objection, Your Honor, best evidence rule.
THE COURT: Overruled.
Go ahead.
MS. OSTROUSHKO: She created a video to showing our -- talking about each one of our restraining orders. Very specific. Talking about my daughter's restraining order, talking about my husband's restraining order, talking about my restraining order. And being very detailed.
And then, the opposite of information we put in there, saying she didn't state -- she stated.
So, after that moment -- then after she -- every time she posts about our family, she gets her followers riled up to that third-party continuation,

the harassment and hate against our family.
Q. Okay.
A. And that is why -- and that is why we asked for the -- for the restraining order to protect ourself from not posting on social media. We have refrained from that against anything with her.
Q. Are there any other reasons why you believe that you're entitled to a restraining order -- a permanent restraining order against Ms. Hernandez?
So, so far you've talked about physical abuse, posted about your business, posted about your work, and you said posts about your -- about her discussing the restraining order.
Are there any other reasons why you believe that you're entitled to a restraining order?
A. Yes. The fact that -- with the restraining order, and her posting it, Jesse also responded saying that we're trying to silence her, and then their comments are getting their followers riled up again stating: We should go dox the judges now, because of false information.
Q. Okay.
And you read those personally?
A. Yes.
Q. Okay.

And how do you know that those -- that those people saying that they're going to dox judges are actually --

A. Because it's in the --

MR. FRANKLIN-MURDOCK: Your Honor, objection. I move to strike as to hearsay.

MR. COOK: Hold on. You've got to listen to the full question though.

Okay?

MS. OSTROUSHKO: Yeah. Sure. Sorry.

THE COURT: Was there an objection?

BY MR. COOK:

Q. So, how do you know that those --

MR. FRANKLIN-MURDOCK: Yes, Your Honor. I objected -- I moved to strike the prior testimony and then I objected to the question based on best evidence rule and hearsay and also relevance.

THE COURT: All right. We're not going to strike the testimony. I will ask that Mr. Cook ask the question again.

Go ahead.

MR. COOK: Okay. Yeah.

BY MR. COOK:

Q. So -- so I guess what I'm asking, Ms. Ostroushko, you've already talked about the post about the

restraining order.

Okay?

So, I want to make sure -- so I need a point of clarification.

Are there any other reasons besides the first four that you've named that you believe that you deserve a restraining order against Ms. Hernandez?

A. To continue to -- to protect our family, to heal, and move forward.

Q. Okay.

Any other specific things that she did which make you request a restraining order against Ms. Hernandez, besides the four that you've already named?

A. She's constantly posting about our family.

Q. Okay.

And you've read these posts with your eyes?

A. Yes. Yes.

Q. Okay.

And what, specifically, did she say?

Give us an A-B-C -- of specific things. Tell the Court A-B-C: She said these things, and this is why I deserve a restraining order.

MR. FRANKLIN-MURDOCK: Objection, Your Honor. Best evidence rule.

THE COURT: Overruled.

MS. OSTROUSHKO: She's basically thanking the third parties for helping her with -- with finding us and -- and doing what they've done to us; exposing my daughter's school, my work. And it was that -- that is the harassment that led to the death threats, to the harassment towards our family, to losing our jobs, to needing protection against our family.

Q. Okay.

So -- so based on these things that you've identified that Ms. Hernandez did, do you believe that many of these things will continue to happen if you don't have a restraining order against Ms. Hernandez?

A. Yes.

MR. FRANKLIN-MURDOCK: Objection, Your Honor. Calls for speculation.

MS. OSTROUSHKO: Yes. Because her -- Savanah Hernandez continues to --

THE COURT: Okay. So I have to rule on the objection.

MR. COOK: You got to -- move to strike. You've got to listen.

THE COURT: We're not striking it. I'll just rule on the objection. So, I apologize for interrupting.

The objection was best evidence; is that

right, Mr. Murdock?

MR. FRANKLIN-MURDOCK: Calls for speculation.

THE COURT: Calls for speculation.

I'm going to overrule that objection. I want to hear the concern from Ms. Ostroushko.

MR. COOK: Okay. And then I'm going to -- Your Honor, I'm going to specifically address Ms. Ostroushko and say, Ms. Ostroushko, you got to -- you got to listen to my question, let me finish talking, and then if you start to hear an objection, you have to let counsel object, and then we have to proceed that way. So, if you can -- okay.

So, go ahead and -- and answer the question, which -- I forgot what it was, to be honest.

THE COURT: Concerns related to --

MR. COOK: If you remember --

THE COURT: -- harassment. Or, alleged harassment.

MR. COOK: Okay. Yeah. Right.

BY MR. COOK:

Q. Do you believe that the -- if you don't have a restraining order against -- if you don't get this permanent restraining order, do you believe that you will continue to be harassed by, say, Ms. Hernandez or other third parties?

A. Yes. Because every time she posts about us -- she has continued this journey of posting our family's name in -- into -- continuing. I mean, we already have a lot going on. We've literally been paralyzed, and I do believe it'll continue throughout this as we are on our own path and journey with other things that we are facing right now.

So, that is where I need to make sure, please, that our names are not listed on social media at all. And it's very important -- that was stated in our HRO, because of her large following of over a million followers across multiple platforms. They listen to her, they follow her, they -- they don't like something, they attack.

Q. Okay.

Is it -- is it your -- you just mentioned Savanah's large following, large platform.

Is it also your understanding that -- that Ms. Hernandez influences national politics in some way?

A. Yes, she does.

Q. Can you explain to the Court?

A. Yes.

MR. FRANKLIN-MURDOCK: Objection, Your Honor. Relevance.

MS. OSTROUSHKO: She is --

THE COURT: There's limited relevance related to the reach, so I'll allow some testimony on this.

Go ahead, ma'am.

MS. OSTROUSHKO: Yes. On all of her posts, it's about the left. It's about the left. Look what the left does. The left is a mob. They -- it's literally a one-sided political attack on our family.

BY MR. COOK:

Q. You mentioned something in your --

MR. FRANKLIN-MURDOCK: Your Honor, move to strike. If there's going to be -- if there's going to be something that sounds like it's a quote from something that has not been put in front of us, that we have no idea what they're referring to, that frankly doesn't exist, that shouldn't be allowed, Your Honor. If they're going to attribute words to my client, they should post it.

THE COURT: I did not receive that as a direct quote from the respondent. But, again, this is of truly limited relevance at this point.

Mr. Cook?

MR. COOK: Yeah.

BY MR. COOK:

Q. And further, in your request -- in your petition for a restraining order, you mentioned that -- I think you

mentioned that there was -- that maybe the president or the director of the FBI or some other national figures responded.

Can you explain that?

A. Yes.

J.D. Vance, at a Turning Point USA event, basically stated that they were going to take Savanah Hernandez' videos and make sure that we are, you know, prosecuted at the highest level and -- to make an example of the Ostroushko family.

Q. And was there also something that was -- was there a similar, kind of, I guess, event or incident related to the director of the FBI? Kash Patel?

A. Yes. He --

Can you please repeat your question?

Q. Did -- so, did Mr. Patel, you know, relay something similar to what J.D. Vance previously -- that you described about J.D. Vance?

A. Yes. He also stated that as well too.

And then, when we got our indictment charges on us, it's like it was a celebration from Kash Patel and all of the government. That they were going to make an example out of us and us leftist people.

Q. Okay.

A. And going after the left.

Q. Based on all these things that you allege, how do you -- how have you been, one, physically injured?
Well, let's start with physical injuries.
A. Mentally, physically -- well, mentally, I can't look -- I can't be on social media. I have trauma. I can't check the mail. I have to wear a hat out in public because I feel everybody's looking at me.
Q. Hold on. I'm going to -- I got to try to interrupt you and regulate.
Talking about physical injuries; bruises -- bumps, bruises, that type of thing. Broken bones.
A. No. No broken bones. I had a cut on my finger after the Whipple event. Other than that, no physical concerns or issues.
Q. Okay.
So, now let's move to, you know, emotional distress. Mental injuries.
Please describe those.
A. I have PTSD. I -- my husband's number wasn't doxxed. My number of 30 years was doxxed, so I'm the one that took up predominantly all of the death threats; the coming after our family to mutilate us, to murder us. I can't go to the mailbox. I am afraid to get mail because of the harassment and the -- of the illegal mail we were getting. I was the one that discovered

all the flyers with these ridiculous, exploited faces of us all over, saying that we're the assaulters of Prior Lake and to beware because we could attack at any time. So, every morning at 5:30 I wake up thinking someone's actually flyered our neighborhood again. I'm seeking -- for mental -- I'm not on social media anymore. I'm afraid to look on social media. Like, I had to force myself to document all of this stuff out there, but it's really traumatic for me.

The stuff at the Whipple building -- the -- I acted -- I'm a -- like I said, I'm a rape victim. So, in terms of being agitated that day agitated me. It triggered me. It brought me back to a lot of things of us standing up for humanity and being a victim, and my daughter being a victim -- as -- a victim too.

So, mentally, I am not doing very well.

Q. Okay.

And you mentioned something about -- you mentioned something about being a rape victim, but what are you talking about? Like, you -- it kind of came out of -- I just want a clarification.

MR. FRANKLIN-MURDOCK: Objection; relevance.

THE COURT: Sustained.

MR. COOK: Well, I'm asking for a clarification, Your Honor.

THE COURT: I don't need that clarified under these circumstances.

MR. COOK: Okay.

THE COURT: Both parties have testified that Ms. Ostroushko is a survivor of some sort of assault. I don't need more information on that, because it's not relevant.

MR. COOK: Okay.

I guess what I was getting to, Your Honor, is your -- Ms. Ostroushko's talking --

BY MR. COOK:

Q. Ms. Ostroushko, you're talking about your mental -- you know, how you've been emotionally affected, and I think -- did you already testify that there was threats of -- I mean, any other types of threats against you?

A. What the docs say?

I'm sorry. I'm not understanding.

Q. Yeah. By third parties?

A. Yes. Yes.

Q. Okay. Go ahead.

Can you describe those threats?

A. Yes. They were -- of rape. They were going to come and rape me. They were going to rape my daughter. They were going to take my husband's dead head and watch his dead head rape us.

Q. Okay.
And then, similarly, in terms of how you've been injured, have you been injured financially?
A. Yes. We've lost all our -- we've lost $300,000 of income on my -- my primary job. I made $102,000 a year. My husband's primary job.
And then, because of our Gecko business, that was posted on Savanah's page -- our Gecko business was doxxed. We had people calling us saying: Do you want to buy geckos? Hey, I want to buy a yellow-bellied gecko.
So, every aspect of our business has been doxxed. We've literally been paralyzed.
Q. Okay.
And then -- so if you don't get this restraining order, these things that you mentioned, right, the emotional abuse and the financial abuse -- do you believe that you will continue to be -- let's start with just the emotional abuse.
If you don't get this restraining order, do you think that the emotional abuse will continue?
A. The emotional abuse will continue.
Could I add one other thing to that, please?
I'm afraid for our lives in terms of these people coming to our home.

Q. Okay.
And go ahead and describe why you're afraid for your life.
A. Because of all of the death threats. We've submitted hundreds of -- which I did provide -- hundreds of text, voice-to-text messages to the Prior Lake Police Department, which have been documented.
Q. Do you know if you -- if you submitted police reports on behalf of you, your husband, and your daughter?
Is that correct?
A. Yes. Yeah.
Q. Okay.
A. And a lot of -- and the threats were towards our family. The threats were towards, you know, him and what they were going to come do to our family. We -- there was someone that replied to one of Savanah's posts, basically saying if we were off -- getting off all charges, that he was going to take one for the team. Like, something about a heart attack, and come and kill us.
Q. Okay.
And if you don't have this restraining order, do you believe that, one, the emotional abuse and the financial abuse will continue?
A. Yes.

Q. Okay.
Also, just another point of clarification.
Before all of this happened, were you also -- I mean, did you consider yourself and your family, I guess -- I don't know how you'd call it -- social media influencers?
A. My -- I had a social media page. My daughter and husband were more active on social media. Yes.
Q. Okay.
Has -- you know, since the things that you alleged in your restraining order, has that social media presence been in any way affected?
A. Yes. We've locked down all of our accounts and have not posted.
Q. Okay.
A. Besides the one video that has been shared about Whipple, we've been staying silent to protect our family and ourselves.
Q. Speaking of the video that was shared about Whipple, the one with you and me and Chris and Ms. Pohland, what was the purpose of posting that?
A. To be contrite, to have the community speak up about that day -- of -- of, you know, what went -- what went wrong, what was right, what could have been done differently in terms of people using their videos and

cameras to document their -- for their next click or their next viral moment; and talking about how things could have done -- been -- gone differently, and our family being contrite about the situation.

But, it was more of listening to the people that were there that day and us coming together to figure out, like, what could have happened differently.

Q. Okay.

There's been a lot to talk about --

Actually, you know what, I'll strike that.

MR. COOK: I guess I'll submit, and no further questions, Your Honor.

THE COURT: Okay.

Cross-exam Mr. Murdock.

C R O S S - E X A M I N A T I O N

BY MR. FRANKLIN-MURDOCK:

Q. Good afternoon, Ms. Ostroushko.

A. (No response.)

THE COURT: Go ahead, counsel.

BY MR. FRANKLIN-MURDOCK:

Q. Now, Ms. Ostroushko, you talked about comments that the Vice President of the United States has made about this incident, correct?

A. Yes.

Q. You talked about statements that the Director of the

FBI has made about this incident, correct?
A. Yes.
Q. And the Acting Attorney General, Todd Blanche, also posted about the incident after a federal grand jury returned an indictment, correct?
A. I don't know about that. I'm sorry.
Q. Fair enough.
Let's talk about -- let's just focus on Director Patel and Vice President Vance then.
Do you believe that Ms. Hernandez told Director Patel or Vice President Vance to talk about this incident?
MR. COOK: Calls for speculation.
A. I'm --
MR. COOK: Make sure you let me object, Ms. Hernandez(as spoken).
Calls for speculation, Your Honor.
THE COURT: It does, and I think that Ms. Ostroushko can offer her opinion, and I will give that the limited value --
MS. OSTROUSHKO: Yes.
THE COURT: -- I think it deserves.
Go ahead.
MS. OSTROUSHKO: Yes, I do. I do believe that there are ties and connections. We have videos

seeing Savanah and other agitators at the roundtable with Trump and the team.

BY MR. FRANKLIN-MURDOCK:

Q. Is there any other reason that, I guess, you believe that Ms. Hernandez caused -- told J.D. Vance to do that and he did it, and she told Director Patel to do it, and he did it?

Any other reason?

MR. COOK: Objection; asked and answered.

THE COURT: Overruled.

You can answer that.

MS. OSTROUSHKO: I believe the ties of things not happening in our state. There were no -- there were no state charges to any of us in our state, but it seemed like we all knew the next move of Savanah -- of indictment charges by a grand jury on the Ostroushko family coming.

So there was a -- so, yes, I do believe that there is -- there was ties and connections to Savanah and the fact that she represents as a conservative influencer on Turning Point USA's website; and the fact that J.D. Vance was sitting at a Turning Point USA event when he had discussed and talked about the Ostroushko family and having a direct conversation with Savanah Hernandez before he made his announcement to

all of social media. Yes. And she thanked the FBI for the indictments on -- and for doing what was right. Savanah Hernandez did.

Q. And just to make sure I understood, is it your testimony that no one in your family has been charged at the state level?

MR. COOK: Objection. It's -- relevance. I'm not even sure --

THE COURT: Sustained.

MR. COOK: -- objection; relevance.

THE COURT: Next question.

MR. FRANKLIN-MURDOCK: Your Honor, if I may make an offer of proof.

THE COURT: Go ahead.

MR. FRANKLIN-MURDOCK: Maybe -- if the witness is directly misrepresenting the fact that her husband, in fact, has been charged by the Hennepin County DA.

THE COURT: I don't know how that would make a difference to me, though, in this very narrow trial on harassment.

So, it's -- I don't think it's relevant to this conversation.

MR. FRANKLIN-MURDOCK: Understood, Your Honor. I'll move on.

And, Your Honor, given that we are talking about the incident on April 11th, just to be candid, I had a lot of videos and examination prepared. I want to make sure we get to Ms. Hernandez. I think it's important to hear from her, so I'm going to skip a lot of that. I think, you know, the Court is inclined to consider that is an evidence, so I'm going to not spend as much time on that. But, I do want to be sure to play Exhibit 210.

So, if we could have that, Madam Clerk.

And, it's a long video, but I think if -- we can just start at four minutes and 30 seconds, and that will expedite things a lot.

THE COURT: You want to start at the four minute mark, counsel?

Or do you want to --

MR. FRANKLIN-MURDOCK: About four minutes 30 seconds.

THE COURT: Okay. 4:30 is --

MR. FRANKLIN-MURDOCK: That way we don't watch four and a half minutes of things that aren't that relevant.

THE COURT: Okay.

(Exhibit was played.)

MR. FRANKLIN-MURDOCK: And can we pause,

please, Madam Clerk?

BY MR. FRANKLIN-MURDOCK:

Q. Ms. Ostroushko, do you recognize this to be a video taken on April 11th at the Whipple Building in Hennepin County?

A. I do.

Q. And do you see yourself in that video?

A. I do. I'm in the black jacket.

Q. The black jacket, black hat, and glasses, correct?

A. That's correct.

Q. Okay.

Can we please play the video?

(Exhibit was published.)

MR. FRANKLIN-MURDOCK: Okay. I think that's enough from this video.

Okay, I think -- thank you.

BY MR. FRANKLIN-MURDOCK:

Q. Ms. Ostroushko, do you -- on my end, there was a lot of lag.

Were you able to hear what was taking place in that video?

A. I didn't hear it very well.

MR. FRANKLIN-MURDOCK: Your Honor, I don't know if it's just me, but every time that I hear from Ms. Ostroushko, there's a lot of lag.

Is that me or is that everyone else?

THE COURT: I'm not experiencing that.

MR. COOK: Not experiencing it here.

MR. FRANKLIN-MURDOCK: Okay. I'll ask the question and -- it's a little tough. I can't hear her answers. I can hear everyone else, but I'll work with what I can.

MS. OSTROUSHKO: Okay.

MR. COOK: Sorry, Tracy.

(Audio plays.)

THE COURT: What is that?

MR. COOK: Sorry about that. I should have put it on mute. My co-worker is speaking. I'll put it on mute.

THE COURT: Okay. Yeah. Please mute yourself. And, we're in the middle of the trial, so Mr. Murdock, I'll ask that you ask your next question.

Go ahead, Mr. Murdock.

MR. FRANKLIN-MURDOCK: Certainly, Your Honor. And I guess the problem on my end is that it's just -- it's freezing and lagging, so I -- I don't know if we can maybe have some people that aren't participating right now turn their videos off to help the connection.

THE COURT: Okay, I -- we could, but go ahead.

MR. FRANKLIN-MURDOCK: Would you mind turning your video off? That way we can -- I think the less pressure we put on the connection the better.

BY MR. FRANKLIN-MURDOCK:

Q. All right.

Ms. Ostroushko, in that video, you stated, I tackled her and then I ran; is that correct?

A. I did.

Q. Okay.

And you were laughing, correct?

A. In the video, I was laughing, yes. Because of --

Q. Okay.

A. Yes, I was.

Q. Go ahead and finish your answer.

Why were you laughing?

A. Because of the adrenaline of after -- of the reaction of tackling Savanah Hernandez after she punched my daughter.

Q. Okay.

And so, in that moment, you were filled with adrenaline. You were laughing.

You didn't think that -- you weren't afraid of Ms. Hernandez in that moment, correct?

A. I was not afraid of Savanah Hernandez in the moment, but I was agitated from the moment that led up to

everything that day; from watching her punch my daughter, from my daughter losing her footing, to pushing her, to her coming after me, grabbing my neck before my husband got involved, where she got up and punched my daughter again, before we went after her because she kept on going.

So, yes, I was agitated in the situation with lots of adrenaline.

Q. Okay.

MR. FRANKLIN-MURDOCK: And, Your Honor, I would ask that Exhibit 210 be admitted into evidence.

THE COURT: Was that the one we just watched?

MR. FRANKLIN-MURDOCK: Yes.

THE COURT: 210 is in.

MR. COOK: No objections, Your Honor.

BY MR. FRANKLIN-MURDOCK:

Q. And, Ms. Ostroushko, you filed a petition for a restraining order on April 17th of this year; is that correct?

A. I'm sorry.

Was that to me?

Q. Yes.

A. That is correct. Yes.

Q. You signed it under penalty of perjury?

A. Yes. Yes.

Q. And, in order to save time, I'm going to read from it. In order to save time, I'm going to read from it, and if you don't -- and if you're not sure if those are your words, then I can show it to you, but in the interest of time, I'm just going to quote from it.

On paragraph 9 -- in paragraph 9, you wrote, quote, she is a social media influencer with a large following, and by sharing our personal information, phone number, and address, she has enabled it to spread viral as part of a defamation and hate campaign.

Are those your words?

A. Those are my words, but I'd like to state one thing.

Yes, those are my words.

Q. That not the question. Your counsel can ask you --

A. Those are my words. Yes.

Q. -- more questions later.

A. Okay.

Q. Okay.

And, on page 12, you wrote, quote, she also engaged in doxxing by publishing our personal information online, including our home address and phone number.

Your words under penalty of perjury.

A. I will take -- not directly, but in terms of posting my work, posting information about our family, and having

third parties spread that information, yes.

MR. FRANKLIN-MURDOCK: And, Your Honor, I'm having the internet -- would it be okay if I turned my camera off in hopes that that helps a little?

THE COURT: Sure. You can try.

MR. FRANKLIN-MURDOCK: It's totally frozen on mine. Okay. Maybe this will help things a little bit better.

BY MR. FRANKLIN-MURDOCK:

Q. Ms. Ostroushko, I did not hear your answer. So, you may have already covered this in the answer I didn't hear, but is it your testimony that Ms. Hernandez shared your phone number on the internet?

MR. COOK: Asked and answered.

THE COURT: He's saying that he didn't hear the answer, counsel, so I'm going to be a little patient to accommodate the tech issue that he may be having.

MR. COOK: No problem.

THE COURT: Okay.

If you could answer that, Ms. Ostroushko.

MS. OSTROUSHKO: Through replying and supporting followers based on condoning what others were doing to us, yes.

BY MR. FRANKLIN-MURDOCK:
Q. Okay.
And is it your testimony that Ms. Hernandez shared your address on the internet and social media?
A. Through supporting her followers who were doxxing our addresses and condoning it, yes.
Q. And you haven't shown any of those posts today, have you?
A. The evidence was provided. I'm not sure what happened at that point today. You have a copy of the evidence, Jesse Franklin.
MR. FRANKLIN-MURDOCK: And, Your Honor, I'm -- my audio is so bad I'm trying to just join on my phone, at this point. I think that's the best thing I can do.
THE COURT: Okay.
MR. FRANKLIN-MURDOCK: Okay. I apologize for that. Now I'm on my phone.
BY MR. FRANKLIN-MURDOCK:
Q. Ms. Ostroushko, can you hear me?
A. I can hear you. Yes.
Q. Okay. Hopefully that solved the problem and everything is fine. I apologize to the Court for that issue.
THE COURT: No need to apologize.
MR. FRANKLIN-MURDOCK: I pay for -- a lot of

money for my wifi. I don't know what's going on, but it is what it is.

BY MR. FRANKLIN-MURDOCK:

Q. Ms. Ostroushko, I didn't hear your last answer.

Could you please repeat it given my tech issue?

A. Condoning her followers who were sharing our addresses, yes.

Q. And I just want to ask you very directly.

Did Ms. Hernandez ever publish a post herself that contained your address or your phone number?

A. She posted things about our Gecko business.

Q. But not your phone number and not your address, correct?

A. Not directly, but condoning her followers from her posts that were posting our addresses through her main post. When she would post, her followers would share our addresses. I have provided that evidence to the Court, and that was sent to you.

Q. And when you say address, do you mean your home address?

A. My home address, our Gecko business. Yes.

Q. But, again, not in evidence today, correct?

A. Our address is public -- excuse me. Our address is published all over her comments.

MR. COOK: Objection; asked and answered.

THE COURT: I'm sorry, Mr. Cook.

What did you say?

MR. COOK: It was a belated objection; asked and answered.

THE COURT: I overruled. I don't know that -- well, I don't think there's a question in front of Ms. Ostroushko at this moment.

Is there, Mr. Murdock?

MR. FRANKLIN-MURDOCK: No, Your Honor. The witness already answered.

THE COURT: Okay. Okay. And I don't think that question had been asked and answered.

Go ahead.

MS. OSTROUSHKO: Could I -- sorry.

Could I ask --

THE COURT: No. Your attorney will redirect --

MR. COOK: You have to wait for counsel --

THE COURT: -- and talk to you.

Go ahead, Mr. Murdock.

BY MR. FRANKLIN-MURDOCK:

Q. And I wanted to just pick up on something you said.

You said there was -- your address was posted in the comments.

You said that, correct?
A. Yes.
Q. Not by Ms. Hernandez though, correct?
A. It was the comments to her followers, but our Gecko business that was posted on her page is associated to our home address. By posting our gecko business, allowed people to look up our L.L.C. to get our home address.
So, by posting all of that information, our address was shared.
Q. Okay.
And is your belief that speaking out about what happened on April 11th on Ms. Hernandez?
MR. OSTROUSHKO: Looks like his mic is turned off.
MR. COOK: Hey.
Mr. Ostroushko, don't -- please don't comment. Don't say anything.
MR. FRANKLIN-MURDOCK: Can you hear me now, Ms. Ostroushko?
THE COURT: We can hear you.
MS. OSTROUSHKO: I can hear you.
BY MR. FRANKLIN-MURDOCK:
Q. Is it your belief that when Ms. Hernandez spoke out about the April 11th incident, that would lead to your

family getting harassment and threats?
A. Yes, because of her video -- was a one-sided edited video that did not show that whole day.
Q. So is it your belief that the more the incident was publicized and the more attention it got, the more threats and harassment you received?
A. Yes. And, from when she posted that video on 4-11 -- shortly after that is when it all started. Within less than 48 hours, we had lost everything, and the threats were coming at us in all aspects of our social media, our phones -- it was coming at us, and how I will describe it is like a wasp nest. Someone kicking a wasp nest, and you have a million really angry people -- one-sided people -- on the political one-sided that she supports, coming after us.
Q. And I won't go through all the exhibits that I went through with your husband, but you also spoke out in public about the events of April 11th, correct?
A. I'm sorry. Spoke out?
Can you clarify?
Q. I'll just be more specific.
You and your husband went on the Pushing the Limits YouTube show with Brian Shapiro, and gave an interview on April 15th, correct?
A. Yes.

Q. And on April 20th, you were in an Instagram reel with your husband Chris, your daughter Paige, your lawyers James Cook and Trisha Pohland, and others, where you discussed the April 11th incident, correct?
A. Yes.
Q. And you and your husband went on One America News to discuss the incident on April 20th, correct?
A. Yes.
Q. And do you understand that One America News is a nationally available news outlet?
A. I know it's a news outlet. Yes.
Q. And, in each case -- when you went on Pushing the Limits, when you posted the Instagram reel, when you went on One America News, you added more public exposure to the April 11th incident, correct?

MR. COOK: Calls for speculation.

THE COURT: Overruled.

You can answer that.

MS. OSTROUSHKO: Yes. Yes. In order to get our version of the story, since it wasn't shared originally. It was a one-side edited video, so we felt we needed to share our story and what happened that day.

BY MR. FRANKLIN-MURDOCK:
Q. And that's your right, isn't it, as an American, to

speak out in public about what you think happened?
A. Yes.
Q. And doesn't Savanah have that same right to speak out in public about what she thinks happened?
MR. COOK: Objection; calls for speculation.
THE COURT: Overruled.
You can answer that.
MR. COOK: Objection; relevance.
THE COURT: Overruled. Overruled. It's a relevant question.
Go ahead. You can answer that, Ms. Ostroushko, if you're able to.
MS. OSTROUSHKO: Can you repeat that question again, please?
BY MR. FRANKLIN-MURDOCK:
Q. Doesn't Ms. Hernandez have that same right that you have, to go out in public and to speak about what she thinks happened that day? On April 11th?
A. Yes, if it didn't have to do with a political party, in terms of stating that we are the left and making it about politics. Absolutely, she could speak about it, but this was a political attack of the left, and she came and supported a left -- she came to agitate a left event that day.
So, Savanah went on Fox and posted more than

96 times on X about all of the media, which Fox and all of the ones -- all the media sources are leaning towards one side.

So, yes, she can speak about it, but it's not like she's a neutral going on neutral media stations talking about the incident. She's getting one side riled up about the incident.

MR. FRANKLIN-MURDOCK: No further questions, Your Honor.

THE COURT: Brief redirect. We have about six minutes for Ms. Ostroushko, and then we'll move on to Ms. Hernandez.

Go ahead, Mr. Cook.

R E D I R E C T E X A M I N A T I O N

BY MR. COOK:

Q. Ms. Ostroushko, you had some questions about the incident -- the April 11th incident, in fact, just a moment ago.

Do you remember that?

A. Yes.

Q. Okay.

And, specifically, you were asked about Ms. Hernandez' First Amendment right and right to be at Whipple; is that correct?

A. Yes.

Q. Okay.
Do you -- so you were there that day. You observed Ms. Hernandez.
Was she there exercising her First Amendment right?
A. She was there to agitate. She was there to -- she was there -- she was not there to report. She was there to agitate and cause problems.
Q. And why do you say that?
Can you give us some specifics as to why you make that statement?
A. There was no time that she ever put her phone down. She came there to exploit our family and others there, calling out other people. Everybody in that video, a part of her third-party followers, also were trying to dox other people, pulling other people out of her videos to go after their company and the -- or, the company that they work for.
So, she was there for her clicks and propaganda to exploit the event we were having that day.
Q. Okay.
You made some comments about, in your -- in the questioning about your petition for an HRO and also just in your responses about her being a social media

influencer.

Why is it so important to mention that she's a social media influencer?

A. Because she has a large following of a million plus followers across platforms, so there are people that follow her. So, when she states something, it can agitate her followers to act.

Q. Okay.

A. And that is what happened here for harassing our family.

Q. Okay.

And how -- okay. And that was going to be my next question.

You know, you were asked about a statement that you made at 4:30 -- 4:30 of Exhibit 210, where you said something about you tackled her and then ran.

Do you remember that?

A. Yes.

Q. And then, in making that statement, counsel asked, you know -- I think he was trying to make the point that you weren't afraid of her.

Is it true that at that moment you weren't afraid of her physically? Is that correct?

A. I wasn't afraid of her physically. Correct.

Q. Okay. Good.

After -- I mean, is there any other reason that you are afraid of her?

A. From her large social media platform and her posting about our family and the one-side political aspect. I'm very afraid of her, because of the trickle-down effect of the death threats and the damage that have been caused to our family.

Q. Okay.

And then, at some point, you say that she grabbed your neck.

So, and you believe that -- can you describe that moment?

A. Yes.

So, my daughter was walking beside her on the side, and she grabbed my daughter's face and lost her footing, and my daughter -- my daughter had then pushed Savanah into the fence, and I had tried to de-escalate the situation by pushing my daughter back, saying: Hey. Hey. Don't do that.

And then my daughter said: She punched me.

So, I went up to her and said -- pointed at her, and I said: Don't f-ing touch my daughter again.

And she grabs my throat and pushes me back before she moves out into the -- to the area where she had stated some comments, and my husband intervened,

and got back -- and then she got up off her feet immediately, and where Paige was in front, Paige said something to her, and she slapped her, and then punched her in the face before, in that moment, I reacted again in self-defense, protecting my daughter, and tackled her.

Q. Okay.

And then -- and you acknowledge that -- that -- that you laughed when you were talking about it after the incident; is that correct?

A. Yes.

Q. Can you explain more why you were laughing when you were talking about it?

A. You know, I --

MR. FRANKLIN-MURDOCK: Objection; asked and answered. I asked that question.

THE COURT: Well, she can answer --

Overruled. Go ahead.

MR. COOK: He asked a yes or no question, so he didn't give her a chance to respond to it. So --

THE COURT: It doesn't -- it's -- I've overruled the objection.

MR. COOK: Okay. Yeah. I'll accept yes as an answer, Your Honor.

THE COURT: Yeah.

MR. COOK: Thank you.

THE COURT: Go ahead.

MS. OSTROUSHKO: It was pure adrenaline. Like, the situation of protecting my daughter; and then kind of running away from the situation; and then talking to someone as my daughter is getting an ice pack on her face because she had just gotten punched; and kind of -- just talking to other people about the situation. So --

BY MR. COOK:

Q. Yeah. Okay. Understood. And --

THE COURT: All right. It's almost -- it's almost 3:30, and we still have to hear from Ms. Hernandez, Mr. Cook.

So, last question and then.

MR. COOK: Yeah. I can wrap it up.

THE COURT: Okay.

MR. COOK: I can wrap it up.

BY MR. COOK:

Q. Just, in general, Ms. Ostroushko, is there anything else that I haven't asked you, that I've left out, that you need to tell the Court, that you can do so very succinct -- in a succinct, kind of, quick manner?

MR. FRANKLIN-MURDOCK: Objection; vague. Calls for a narrative.

THE COURT: Sustained.

If you have a specific question, Mr. Cook, go ahead, but I can't open the door to a chat at this point.

MR. COOK: Okay.

BY MR. COOK:

Q. Ms. Ostroushko, do you believe that if -- if -- if this -- if you're not granted a permanent restraining order that Ms. Hernandez will -- will somehow invoke third parties to continue harassing you? That is, you know, by calls, texts, so on, and so forth.

A. Yes.

MR. FRANKLIN-MURDOCK: Objection; calls for speculation. Misstates the evidence. There's been no evidence that Ms. Hernandez has done anything like that.

THE COURT: Overruled.

MR. FRANKLIN-MURDOCK: Okay.

MR. COOK: That's it. No further questions, Your Honor.

THE COURT: Okay. The question has been answered.

Mr. Murdock, are you prepared to move on from Ms. Ostroushko?

MR. FRANKLIN-MURDOCK: May I ask one recross

question, Your Honor?

THE COURT: Sure.

R E C R O S S - E X A M I N A T I O N

BY MR. FRANKLIN-MURDOCK:

Q. Ms. Ostroushko, you said that your daughter had an ice pack after the incident, correct?

A. Yes.

Q. Isn't it true that to the extent that your daughter had some injury at -- that -- she'd in fact said publicly that that's because of what the sheriff's deputies had done to her when they had an interaction with her after the event, and not anything that Ms. Hernandez had done?

MR. COOK: Misstates the facts.

MS. OSTROUSHKO: The ice pack had happened after.

MR. OSTROUSHKO: No. It was before.

MR. COOK: Misstates facts. Also assumes facts not in evidence.

THE COURT: There are -- none of these facts are in evidence in the record as far as -- do I have that information, Mr. Murdock?

MR. FRANKLIN-MURDOCK: Your Honor, I'm asking Ms. Ostroushko to give her explanation as to -- and I think she was starting to before her husband cut her

off -- to say that, in fact, if miss -- if Paige Ostroushko was injured that day, isn't it true that Paige attributed those injuries to the sheriff and not to Ms. Hernandez?

MS. OSTROUSHKO: No.

MR. COOK: Your Honor, assumes facts.

MR. FRANKLIN-MURDOCK: We'll pick it up another day, Your Honor. I know we have a lot to get through today.

So, with that, I would like to offer Ms. Hernandez's testimony.

THE COURT: Okay. And I'll just be really clear. I'm trying to get everyone in in the limited time. I know that there was a request for an expedited hearing. We wanted to grant that. We wanted to consolidate. All of those things have occurred, but we are on a limited time -- timeframe today.

Ms. Hernandez, I'm going to ask that you unmute and raise your right hand, so I can swear you in and place you --

MR. COOK: Before you do that, Your Honor.

So are we going to go 15 minutes and 15 minutes for each side or something like that? Are we going to set a timer? Or how are we going to do this?

Because I'm assuming that the court wants to

be done by a certain time. so -- Because we want to make sure that we're able to cross-examine Ms. Hernandez as well.

THE COURT: I understand that. We're going to get going. I'm not going to commit to a timeframe. The past two hours --

MR. COOK: Okay.

THE COURT: -- over two and a half hours have been for your clients, Mr. Cook. So --

MR. COOK: Okay.

THE COURT: -- we're going to get going.

Ms. Hernandez, if you could, please raise your right hand and unmute.

Do you swear or affirm to tell the truth?

MS. HERNANDEZ: I do.

(The witness was placed under oath.)

THE COURT: Thank you. You can put your hand down.

Can you please state your full name and provide me with your date of birth?

SAVANAH RENEE HERNANDEZ,
The witness in the above entitled
matter after having been duly sworn
testifies and says as follows:

MS. HERNANDEZ: Savanah Renee Hernandez,

October 4th, 1996.

THE COURT: All right.

Go ahead, Mr. Murdock.

MR. FRANKLIN-MURDOCK: And, Your Honor, just one question about timing. Obviously, I have a very large outline here, and I'm going to have to compress it even after your comments to Mr. Cook.

Would it be helpful for Your Honor to walk through what happened on April 11th, or would Your Honor rather hear about what happened after?

Because we could go through, in very painstaking detail, what happened on April 11th, but that would take some time.

THE COURT: I can't tell you how to direct the questions. So, I'm just going to ask that you decide what is important to your client, and that you present your case to me in doing so.

MR. FRANKLIN-MURDOCK: Okay. Understood, Your Honor.

D I R E C T E X A M I N A T I O N

BY MR. FRANKLIN-MURDOCK:

Q. Ms. Hernandez, do you live in Minnesota?

A. No.

Q. What do you do for work?

A. I am a reporter and a political commentator.

Q. What subjects do you report on?
A. I report on nationwide protests and basically anything that is of national interest.
Q. And I think we've heard some testimony today that you're an agitator.
Do you recall hearing that?
A. Yes.
Q. Are you an agitator?
A. No.
Q. Why do you say that?
A. I would say that because, again, my job is a reporter and I go in and I ask people questions. And, as we saw in that video, I was even there asking Paige Ostroushko herself why she was there, why that was important to her that day, and getting more information about what happened to her boyfriend's father.
Q. Okay.
And so, we kind of got into this a little bit, but you were at the Whipple building on April 11th; is that right?
A. Correct.
Q. Why were you there?
A. I was there to, again, conduct point-and-shoot observational journalism for my job. I go and I cover these types of protests regularly. And, basically,

what I do is I point a camera and then I put a neutral caption up on our front lines page -- we utilize X -- to distribute B-rolls to, again, highlight the scene, show what's going on, and that's what I was doing there that day.
Q. Were you there with the intent of instigating any confrontation with protesters?
A. No. If anything, I even specifically was there by myself, because I did not want to conduct interviews because I know that, especially in Minneapolis, this has been a flashpoint since January. And I didn't want to put myself or any of these protesters in any type of position where anybody could even feel agitated, which is why I was there alone.
Q. Do you recall the name of the protest?
A. It was the -- and pardon my French -- but this is what it was called. It was the Fuck Ice National Protest.
Q. Okay.
Did you have any security guards with you that day?
A. No. I was alone.
Q. Were you carrying a weapon?
A. No.
Q. Did you have anyone -- other reporters who were your friends or anyone affiliated with you that was there

that day?
A. No.
Q. How tall are you?
A. 5'4".
Q. So, as a 5'4" woman, alone in a protest, comprised mainly of people on the opposite political side of you, no security and no weapons, was it your goal to engage in a physical confrontation that day?
A. No. Like I said, I was not even planning on going and asking questions, and the only time I did is when I began getting screamed at and mobbed.
Q. And approximately what time did you arrive at the protest?
A. Around 12:30 Central time, I would say.
Q. And how long were you there before, I guess, those videos that we've seen earlier?
A. I want to say that I was there for a full hour. Again, I was conducting this observational journalism. I made it a point to stand up next to the other press members who were wearing vests that more clearly stated that they were press, so that way people knew as well that I was also a member of the press. So, I tried to make that very clear.
Q. Okay.
Can you still hear me, Ms. Hernandez?

A. Yes.
Q. Okay. I'm doing the best I can with the internet issue. I apologize to everyone.
And, at some point -- and I'm not going to run through all the videos, just in the interest of time, but I'm just going to have you talk a little bit about what happened that day.
Did someone in the crowd identify you as someone affiliated with Turning Point USA?
A. Yes.
Q. How did that happen?
A. I want to say it was this man named William Kelly who came up to me and initially identified me, and he started screaming at me very aggressively. At that point, a mob started forming. And, again, it's not like they knew my name or who I was. They had just figured out I work with Turning Point USA, and so that was the catalyst of the mobbing.
Q. And do you recall an initial interaction between you and then Paige and DeYanna -- actually, with all three Ostroushkos.
Do you recall an initial interaction that day?
A. Yes.
Q. Can you tell the Court about what that initial

interaction was like?

A. Sure.

So, again, I had people coming up to me and mobbing me and being very aggressive, and I was trying to just, kind of, tone it down and just say: Okay. Well, tell me why this is important to you. Tell me what's been going on here in Minneapolis.

Even when Paige was getting very angry, she and I actually had a pretty civil conversation because I was able to, with my questions, kind of redirect and say: Well, why is this important to you? Tell me about your story? Why are you here today?

While that was happening, Chris Ostroushko was behind me, screaming at me and calling me a bitch multiple times. That's why I'm smiling in the video, because I'm kind of shocked at the reaction. And then, DeYanna Ostroushko comes up to me and very aggressively starts trying to essentially force me to give my own political opinion when I wasn't there to do that. She then tried to bring up rape and, you know, has stated publicly that I was laughing about rape. But, in the video I state specifically that that's why I cover the border and illegal immigration issues, because of the high rates of rape for children and women specifically.

So DeYanna and Chris were the first ones to

make contact with me. Again, DeYanna had to be held back by protesters, because she was getting so aggressive. Chris shoved me from behind. At multiple points I tried to walk away from Chris, Paige and DeYanna. They continued to follow me.

The reason why you see me at the fence in this video is because I knew there were police across the street, and I was, kind of, just hoping that they would come in and defuse the situation. I didn't want to walk through the mob, because I knew that -- again, these were very aggressive people who were already violently screaming at me, so I didn't want to give them an opportunity to even accidentally touch them. So, I went to the fence and hoped the cop would come. No police officer did. Paige was right in my face at that point. And, you know, at that point, I was like I guess I'm going to have to leave, because the police are not going to intervene on this.

And then, again, that's when the attacks from all three of them ensued.

Q. Okay. Let's zero in on that moment where -- do you recall Paige blowing a whistle right in your ear?

A. Yes. She came up to me multiple times that day after I had tried to walk away from her, and it was that last time she had came up to me and really tried to get as

close as possible to me. That's why I put my hand up, because the whistle that close to my ear was quite painful. And, at that point, she had already come up to confront me, I want to say, three or four times, and I kept trying to walk away. And so, you know, it was very clear she wanted a confrontation.

Q. Okay.

And is there a moment where you made contact with the whistle itself?

A. Yes.

Q. Can you tell the Court what was going on in that moment?

A. Sure. I had multiple people around me blowing whistles in my ear. Like I said, this had already been going on for a while, and I was already just like trying to defuse the situation in any way that I could. And, again, I was standing at the fence in hopes the police officers would come and, kind of, just like take me out of that situation. That didn't happen.

Again, Paige came up to me and was inches from my face, and she felt that she had a right to blow this whistle inches from my ear, and so I pushed her back because I have a right to personal space as well. Keep in mind that Chris and DeYanna had both shoved me, at this point. DeYanna had come up to me and was

waving dildos and hitting me in the face with the dildo. She was pressing her body up against me, as you could see in that video. At that point, they had already touched me multiple times and shoved me multiple times.

Q. Okay.

And you got into this a little bit, but can you tell the Court what the physical experience of having the whistle blown right in your ear felt like?

A. Sure. It was excruciatingly painful. My ears were ringing for days after. I mean, they still ring to this day. Because, again, it wasn't just that whistle. It was DeYanna, herself, blowing this giant horn in my ear. It was all of the other protesters kind of taking turns coming in and blowing whistles all around me, but then again, Paige trying to get as close as possible to my ear, especially as I was trying to walk away as well. There was never a point in which she let me walk away. Again, the family continued to come up to me multiple times as I tried to walk away.

Q. And -- okay.

So you've just described kind of the moment where you dislodged the whistle.

What happened after that?

A. At that point, I realized I just needed to try to leave

the situation myself, and, again, per the video as you can see I had to walk through the mob, because there was no place for me to exit or escape. I was completely surrounded.

As I'm walking away, again, Paige is making an effort to be as close as she can to my face, and as I'm trying to walk -- again, I'm walking into her, I guess, so she decides to grab me and slam me on the ground. I get up, and I put my arm out, as seen in the video, to try to create space. She comes and lunges and punches me in the face again. I get up. I'm continuing to try to leave. I see DeYanna come up behind me and start charging me and screaming at me, which is why, again, I put my arm out to defend myself because she was clearly going to attack me.

As I'm walking away, I turn around and just say: Don't touch me.

Because, at that point, Paige had already slammed me and punched me a couple times, and DeYanna already tried to attack me as well.

That's when Chris decided to slam me on the ground.

Q. Let's stop there. I want to unpack what you said a little bit before you move onto Chris.

Okay?

A. Sure.
Q. So, did you hear Ms. Ostroushko, in her testimony, say that you grabbed her neck?
A. Yes.
Q. And you just described right now a moment where -- I think you used the word charge.
Ms. Ostroushko charged you?
A. Yes. The only reason I was even near enough to put my hands on her is because she had come up to me as I was trying to leave again.
Q. So when you -- when you touched her, what was -- what were you trying to do there?
A. Defend myself, because at that point every time I turned around somebody was attacking me from behind, and, at that point, it was DeYanna.
Q. Okay.
And then, I think you were going to start next to talk about what happened with Chris after that incident.
A. Yes. So, I'm basically standing there and I'm like: Don't touch me.
Because I'm trying to leave, and then Chris comes and slams me to the ground. The first thing that I see when I get up is Paige in my face looking like she's going to attack me again. That was the one and

only time in that entire incident where I was like: Okay. I feel like I have to defend myself at this point, because these people are not letting me leave. I'm trying to leave. I didn't -- I've been attacked three or four times at this point. I get up and the first thing that I see is Paige. I try to throw a punch at that point, because I was like: I have to defend myself. I missed, which is why, again, you won't even see any evidence from Paige of any injuries that are documented, because I did not make any contact with her face at all.

At that point, Paige and DeYanna then tackled me to the ground. I got up, and then you can see Chris continue to try to charge me as, again, I'm trying to leave.

Q. And can you describe the physical sensations both of Chris shoving you, and then that last attack with DeYanna and Paige?

A. Sure. It was incredibly painful. Chris is a lot bigger than I am. So, having somebody that big slam me to the ground is pretty painful. I -- my entire neck was stiff the next day, because of how forcefully he shoved me to the ground. This is the first time in my life that a man has so violently put his hands on me. And, you know, Deyanna's talked about having PTSD. Her

husband brutally assaulted me in front of the entire nation, and the reason I had my phone up is because I knew that that was the only evidence I was going to have to show what happened and what these people were doing to me.
Q. Okay.
And after that final attack by Paige and DeYanna, what did you do?
A. I continued to try to leave. Again, multiple protesters were still coming up to me and screaming in my face. An officer finally got to the scene, and at that point I had to be escorted away by the police. I showed up in an Uber, because, again, this was a protest at noon on a Saturday. I was planning on going there, doing point-and-shoot journalism, and then leaving after an hour and a half or two hours, because the protest itself was only supposed to be two hours.
So, again, to just give you an example of how I did not want to agitate at all, I didn't even have a form of leaving the protest without getting an Uber. I was escorted out by the police.
Q. Okay.
Based on what happened that day with Chris, DeYanna, and Paige Ostroushko, were you injured?
A. Yes. I had a sprain to my knee. I walked with a limp

the next day. I had a sprain to my ankle. I had intense lower back pain. I also had a concussion. I couldn't turn my neck for two days after because of how stiff and sore my muscles were. My wrists were sprained because, again, when Chris slammed me on the ground, I caught myself with my hands. I had rocks embedded in my hands as well because of --

Again, you know, it wasn't even just Chris that slammed me on the ground. It was Paige. She pushed me into the fence, and then, like, kept slamming on me, so I was pretty beat up for a couple of days after.

And then, you know, there's also a mental aspect of that as well.

Q. Let's talk about those mental aspects.

Can you describe that for us?

A. Sure.

So, DeYanna talks about how after everything happened, adrenaline was rushing and she was laughing. I wasn't laughing after this, because I was very brutally assaulted. I was in shock. I was horrified about what I had just experienced. I didn't laugh for a long time after this happened, because of how traumatizing it actually was to me.

I don't like being perceived as weak, but

this is a very difficult situation for me. And I actually ended up having to cancel a lot of major media hits that I normally would move heaven and earth to do -- because, again, I'm a reporter. That's my job -- and I initially went on a couple of shows, because I was like, you know, this is my job. This is a national news story. I've got to talk about it. I realized that I couldn't mentally handle watching the video. It's still hard for me to watch to this day, and I canceled all of my news hits for the rest of the week because I just mentally couldn't handle watching the video, discussing it -- it's still hard for me to discuss to this day. And it's just -- I don't like using the word trauma. I think it's very overused, but this was a very traumatic situation, I would say.

MR. FRANKLIN-MURDOCK: And, Madam Clerk, can we please see Exhibit 215?

BY MR. FRANKLIN-MURDOCK:

Q. And given my connectivity issues, Ms. Hernandez, can you just say something once it's on the screen?

A. Sure.

Okay. It's on the screen.

THE COURT: Can every -- oh, go ahead.

BY MR. FRANKLIN-MURDOCK:

Q. What is this picture?

A. That is a picture of my bruised and swollen knee.
Q. Did you take this picture?
A. Yes.
Q. When?
A. The day after the assault occurred.
MR. FRANKLIN-MURDOCK: Your Honor, I offer Exhibit 215 into evidence.
THE COURT: 215 is in.
MR. COOK: Your Honor, I would object saying that it lacks foundation. He hasn't -- I mean, he hasn't even proven that it's her knee. I mean, we have no way of even knowing that it's her knee.
THE COURT: Okay. Well, I think that the witness's testimony -- or, Ms. Hernandez's testimony is sufficient, under the circumstances.
MR. COOK: Okay.
THE COURT: So that's overruled. 215 is in.
BY MR. FRANKLIN-MURDOCK:
Q. Ms. Hernandez, do you recall shouting at one point during the incident "my glasses broke"?
A. Yes.
Q. Were they broken?
A. Yes.
Q. What's your understanding of how they broke?
A. After Paige had thrown me down and tackled me, and then

DeYanna got on top of me and tackled me as well, I had fallen on my glasses, and, essentially, one of the arms was widened and almost popped off. And I've since had to get them repaired, but they still don't sit properly on my face, and I already got new ones that are currently in the works that I'm waiting for.
Q. Thank you.
Would you say you have a large social media following?
A. Yes.
Q. Did you post about the incident on April 11th -- on social media?
A. Yes.
Q. And have you continued to post about the incident and the Ostroushkos since the incident occurred?
A. Only updates that are relevant to, again, a story that has national attention and interest.
Q. Have you ever posted their address?
A. No.
Q. Have you ever posted their phone number?
A. No.
Q. Was that an intentional choice you made not to post their address and phone number?
A. Yes. And I actually also made multiple public statements stating that I do not agree with doxxing,

and that anybody who was doxxing this family or harassing or threatening them, I do not agree with, and I do not condone. So, I would like that to be on the record as well.

And, also, the only information I've ever shared about this family was information that was public.

Q. And when we talk about public information, you posted about a GoFundMe that was created for Paige and her boyfriend, correct?

A. Yes.

Q. And you posted about the criminal charges in federal and state courts against the Ostroushkos; is that correct?

A. Yes.

Q. And you posted about Chris and DeYanna Ostroushko suing their daughter Desiree for a little over $1,000 for money they lent her for rent after she escaped an abusive relationship shortly after Desiree spoke out in favor of you, correct?

MR. COOK: Objection, Your Honor, that's irrelevant. Also, assumes facts not in evidence.

THE COURT: All right. It's irrelevant to the larger issue of harassment; however, it's relevant. She's -- the respondent is acknowledging the topics

about which she posted about the Ostroushkos, so overruled.

MR. COOK: Your Honor, they're trying to bring up, you know, inter-familial situations.

THE COURT: That's not happening. I'm not allowing any of that.

MR. COOK: Okay.

THE COURT: I'm not hearing any substance on any inter-familial disputes.

MR. COOK: Okay.

THE COURT: I'm just hearing what Ms. Hernandez is admitting to disclosing to her followers.

MR. COOK: Got it.

MS. HERNANDEZ: Yes. So Desiree Ostroushko had reached out to me.

THE COURT: Oh, no. No. There's no question before you.

Mr. Murdock?

There's no question before you, Ms. Hernandez.

Mr. Murdock, your next question.

MR. FRANKLIN-MURDOCK: Sure.

BY MR. FRANKLIN-MURDOCK:

Q. And, Ms. Hernandez, you posted about a lawsuit you filed in federal court against all three Ostroushkos,

correct?
A. Yes.
Q. And you posted about the fact that the Ostroushkos had sought restraining orders against you, correct?
A. Yes. Because, again, this was an update to a case with national interest.
Q. And you posted about the media appearances that Chris and DeYanna had made after the incident, correct?
A. Yes.
Q. Why did you make all of these posts that we've just been talking about?
A. Because I am a reporter, and this is not only, again, partially what I do, but also as the victim of this brutal assault. I wanted to highlight, again, not only for myself, but for other journalists, the potential danger and risk of what is happening outside of these various ICE facilities. I was there to conduct point-and-shoot observational journalism, and this is what happened that day.
So, this is -- essentially, not only as the victim of this, highlighting what happened and what's going on in the streets of the United States of America, but also as a reporter who has focused very much on violence -- political violence, on both sides, mind you, because DeYanna and Chris keep trying to say

this is a political one-sided thing. However, I've highlighted violence on both sides of the political aisle throughout my career, and I've been also critical of this Administration and past administrations. So, this wasn't political. It was very much my reporting of what was happening.

And, again, I also even shared the clips of Chris himself stating that his family was doxxed to state that this is not something that I agreed was right, and that it shouldn't be happening.

Q. And I missed this earlier. I apologize.

Did you ever post a picture of the Ostroushko's home or anything like that?

A. No.

Q. Did you post the name of Mr. Ostroushko's employer?

A. No.

Q. Do you even know the name of Mr. Ostroushko's employer -- former employer, I guess?

A. No. And I also don't know the name of Deyanna's either.

Q. Did you tell anyone to contact or harass the Ostroushkos in any way?

A. No. And, again, I doubled down on the fact that I did not agree with anybody doing that, and from day one I stated that I want to utilize the full force of the

legal system to make sure that justice is served.
Q. Was it ever your intent to cause harm to Chris or DeYanna as far as their safety or security?
A. No.
MR. FRANKLIN-MURDOCK: Just a couple final questions, Your Honor. I really did do my best to condense this.
THE COURT: Thank you.
MR. FRANKLIN-MURDOCK: I've probably done less than a third of my outline.
BY MR. FRANKLIN-MURDOCK:
Q. Ms. Hernandez, did you tell the Vice President of the United States, J.D. Vance, what to say about the Ostroushkos?
A. Nope. When the Ostroushkos heard about this, it's the first time that I heard about it as well.
Q. Did you tell the Director of the FBI, Kash Patel, what to say in public about the Ostroushkos?
A. No.
MR. FRANKLIN-MURDOCK: No further questions, Your Honor.
THE COURT: Thank you, Mr. Murdock.
Mr. Cook, cross.
MR. COOK: Yes.

C R O S S - E X A M I N A T I O N

BY MR. COOK:

Q. Ms. Hernandez, what is point-and-shoot journalism?

A. So, it's me going out with a camera and basically taking an observation of what's going on at the scene, not interacting, not really getting involved, but just truly showing people so they can make their own observation about what's going on.

Q. Okay.

But you do actually make commentary when you do your point-and-shoot journalism; is that correct?

A. No, not for the observational point-and-shoot journalism.

Q. Okay. But we did catch you on camera commenting, for instance, about detainees; is that correct?

A. Only after DeYanna had asked me --

MR. FRANKLIN-MURDOCK: Objection; argumentative.

THE COURT: Overruled.

Go ahead.

MR. COOK: Okay.

THE COURT: No, I --

BY MR. COOK:

Q. So, you were saying only after you were asked?

A. Yes. Only after DeYanna had come up to me and asked me

about that. It was not my intention that day to make my own commentary about that situation or the protest.
Q. But in that situation you did make your own commentary; is that correct?
A. I responded to your client. Yes.
Q. Okay.
And, at some point -- so you went beyond point-and-shoot journalism; is that correct?
By making commentary; is that correct?
A. Well, at that point, that wasn't my observational journalism anymore, because I was being mobbed.
Q. Okay. So you admit that you were doing something beyond this typical, as you call it, point-and-shoot journalism; is that correct?
A. Well, that wasn't the point-and-shoot journalism that I was conducting, because that was a different situation that was happening.
So, I would separate the two, because my journalism that day was separate from, again, the Ostroushko family attacking and mobbing me.
Q. Okay.
MR. COOK: I move to strike everything where she said "the Ostroushko family was attacking and mobbing me."

BY MR. COOK:
Q. Ms. Hernandez, you -- so you did -- at one point, you said something to the effect, in response to Paige Ostroushko, that it's okay for illegal immigrants to be raped, because they're illegal; is that correct?
A. No.
MR. FRANKLIN-MURDOCK: Objection; misstates the evidence.
BY MR. COOK:
Q. Okay.
Well, you said something to the --
MR. COOK: Go ahead, Your Honor.
THE COURT: Okay. So, I'm going to sustain the objection, but we've already heard Ms. Hernandez's response so we're going to keep moving.
BY MR. COOK:
Q. Okay.
Ms. Hernandez, you were wearing a badge that day, a press badge; is that correct?
A. Yes, because I wanted people to know that I was press.
Q. Okay. I'm just asking you to --
MR. COOK: Move the strike, Your Honor.
BY MR. COOK:
Q. Yes or no, you were wearing a press badge; is that correct?

A. Yes.
Q. You were not wearing a press badge for Turning Point USA; is that correct?
A. That's incorrect.
MR. FRANKLIN-MURDOCK: Objection; vague as to Turning Point USA.
MR. COOK: Okay.
MR. FRANKLIN-MURDOCK: Is that an event?
THE COURT: Overrule the objection.
What's the next question?
BY MR. COOK:
Q. It wasn't a badge that specifically identified a news agency; is that correct?
A. Yes.
Q. Okay. And the -- you state that you were working for a specific news agency that day; is that correct?
A. No. I was just wearing my press badge, but I wasn't stating to anybody who I worked for. They found that out on their own.
Q. Who were you working for that day?
A. Turning Point USA.
Q. Okay.
And so, are you -- are you --
On that particular day, were you actually a freelance photographer working in the capacity as an

employee of Turning Point USA?
A. I am an employee of Turning Point USA.
Q. Okay.
Were you on that specific day?
A. Yes.
Q. Okay.
And then, as an employee of Turning Point USA, you were tasked with going to that specific rally to point and shoot; is that correct?
A. Yes.
Q. Okay.
And Turning Point USA -- just to give some context, that's a conservative -- right-wing conservative media publication?
A. Yes.
Q. Okay.
And they specifically sent you to this -- I guess you'd, quote-unquote, left-wing celebration, you know, called Fuck ICE; is that correct?
A. Yes.
Q. Okay.
And then Turning Point USA actually is not opposed to ICE activities, at that time, in Minneapolis; is that correct?
MR. FRANKLIN-MURDOCK: Objection, Your Honor.

The witness is not here to testify for what an entire organization believes to the extent that an organization can have beliefs.

MR. COOK: Goes to the fact that she was an agitator, Your Honor. She wasn't there as a journalist. She was there as an agitator.

THE COURT: I'm sustaining -- I'm sustaining the objection.

MR. COOK: Okay.

BY MR. COOK:

Q. So, again, Turning Point USA is -- you already testified that Turning Point USA is a right-wing -- right-wing media; is that correct?

MR. FRANKLIN-MURDOCK: Objection; asked and answered.

THE COURT: Yes. Sustained.

MR. COOK: Okay.

BY MR. COOK:

Q. You stated that -- that -- when we watched the video earlier, it's correct that you pushed Paige's face twice; is that correct?

A. No.

Q. Okay.

So you're saying after seeing the video -- that is both videos, I think it was 203 and 205 -- you

saw those videos when they were showed to Mr. Ostroushko; is that correct?
A. The only time I made contact with Paige's face was --
Q. Hold on. I'm not asking that question. I'm asking you, did you see those videos --
A. Yes.
Q. -- Ms. Hernandez?
All right.
You saw them when your counsel showed those videos to Mr. Ostroushko; is that correct?
A. Yes.
Q. Okay.
In those videos -- at the end of 203 -- let's just talk about the end of 203.
You shoved Paige Ostroushko's face; is that correct?
A. Yes. Because she was in my personal space.
Q. Nope.
MR. COOK: I'm going to move to strike everything after the yes.
BY MR. COOK:
Q. Second, in the video number -- Exhibit 205 --
You saw when your counsel showed that video to Mr. Ostroushko; is that correct?
A. Can you reframe your question?

Q. Yeah.

MR. FRANKLIN-MURDOCK: Your Honor, I would ask that counsel play the videos. It's -- we don't have a memory -- not many of us have a memory of saying which exact video is which video. So, this seems deceptive and vague.

MR. COOK: Yeah. B.S., Your Honor. He actually didn't tell you the videos when he was talking about them before. Also, we don't have the time to do that, I think.

THE COURT: Well, we --

MS. HERNANDEZ: I just don't know which video you're referencing. That's the only problem.

THE COURT: Yeah.

Why don't we play it so that we can actually get some meaningful testimony.

MR. COOK: Okay.

THE COURT: So --

MR. COOK: Yeah. Let me -- okay.

THE COURT: Which one do you want to play?

MR. COOK: Well, why don't we -- 205.

THE COURT: 205.

(Exhibit was published.)

MR. COOK: If you can just stop right there.

BY MR. COOK:
Q. Okay. So just right there, did you see you used the back of your hand to shove Paige's head?
A. Yes.
Q. Okay.
MR. COOK: If you want to continue playing from there.
(Exhibit was published.)
MR. COOK: If you can just stop right there.
BY MR. COOK:
Q. So, actually -- did you see when you shoved Paige's face again?
A. No. She's walking into me.
Q. Okay.
So you didn't see where you shoved Paige's face again. She --
Are you saying that she walked into your hand?
A. No.
MR. FRANKLIN-MURDOCK: Objection; asked and answered.
MS. HERNANDEZ: I'm saying I'm trying to leave, and she's right up against me that entire time and refusing to let me leave.

BY MR. COOK:
Q. You have your hand up.
Are you saying that you did not use your hand to shove her face away --
A. Not in that instance.
Q. -- based on that video?
Okay.
A. Not in that instance.
Q. And you -- you saw -- so I'm going to say -- I'll characterize it as you shoved her face away, and then Paige retaliated; is that correct?
A. Incorrect.
Q. Okay. So that --
So, are you saying that the video -- the video is completely incorrect?
Is that what you're saying?
MR. FRANKLIN-MURDOCK: Objection --
MS. HERNANDEZ: I'm saying --
MR. FRANKLIN-MURDOCK: Objection. Your Honor, argumentative. Counsel is basically testifying and arguing with the witness at this point.
MR. COOK: I'm just asking her --
THE COURT: So --
BY MR. COOK:
Q. Is the video incorrect?

THE COURT: So, let me rule -- can I rule on the objection, please?

MR. COOK: Sorry about that, Your Honor.

THE COURT: Okay. So, I'm going to sustain the objection.

Mr. Cook, why don't you ask the question just piece by piece and tackle it that way, please.

MR. COOK: Okay.

Or, if Mister Clerk could scroll backwards, like, maybe 30 seconds. Are you in the video up -- I think we're talking about 205.

MR. FRANKLIN-MURDOCK: And, Your Honor, while that's happening --

MR. COOK: I actually can't see the video at that point.

(Exhibit was published.)

MR. COOK: If you could scroll back 30 seconds from there.

(Exhibit was published.)

MR. COOK: So, if you could stop right there.

Actually, you've got to go back. I'm looking for the part where she shoved her face. Right -- stop right there. If you can go forward.

MR. FRANKLIN-MURDOCK: Your Honor, I significantly curtailed all of my examinations today in

the interest of time. Your Honor has the video in evidence. I would object to this continuous argumentation and characterization of the video by counsel.

THE COURT: Okay. I'm going to overrule that objection. I'm giving Mr. Cook the time that he is due. If this is how he chooses to spend this time, that's his choice.

What is your question, Mr. Cook?

MR. COOK: Yeah. Your Honor, I'm just trying to show that Ms. Hernandez is actually -- you know, I'm trying to show that she's contradicting what's actually on the video. So, if I -- if you can indulge me for, maybe, a couple more questions on this.

THE COURT: Okay.

MR. COOK: You know, I'd appreciate it.

THE COURT: Ask the questions.

MR. COOK: Okay.

So, if you can scroll forward, Mister Clerk.

And if you can stop right there.

THE COURT: Okay.

MR. COOK: So --

Actually, if you can go forward just a little bit more. And stop. Okay.

So, I guess from this angle, it's a little

bit unclear.

If you could go back to 203.

MS. HERNANDEZ: I'd like to explain to you what is happening.

THE COURT: No. No. No. There's no question.

MR. COOK: I didn't ask you a question, Ms. Hernandez.

THE COURT: There's no question in front of you.

MR. COOK: You don't need to explain anything.

THE COURT: Mr. Cook --

MR. COOK: You can -- yeah. I'll ask you a question.

THE COURT: Okay. Ask the question though, Mr. Cook, because -- there's no question. We're just waiting for one.

MR. COOK: Okay.

BY MR. COOK:

Q. You testified about this physical -- you remember you testified about the physical experience of Paige blowing a whistle? About the physical experience of blowing a whistle?

Do you remember that, Ms. Hernandez?

A. Yes.
Q. Okay.
What about the physical experience of pushing Paige's face?
Do you remember that?
A. Sure.
Q. Okay.
And you remember the physical experience of pushing her face with the back of your hand; is that correct?
A. Yes, I did it as lightly as possible to make space, but as so as not to hurt her.
Q. Okay.
Also, you admit that you dislodged the whistle when you pushed her face.
Do you remember admitting that?
A. Yes.
Q. Okay.
And the physical experience is you pushed her face enough to dislodge the whistle; is that correct?
A. Yes.
Q. Okay.
You say that Chris -- Mr. Ostroushko slammed you to the ground.
Do you remember that?

Do you remember testifying to that?
A. Yes.
Q. Okay. He actually pushed you to the ground from behind; is that correct?
A. Yes.
Q. He didn't slam you. He didn't take you and grab you by your side and then slam you on the ground --
THE COURT: Okay. Wait. Wait.
Q. -- is that correct?
THE COURT: Do you have a -- is there a semantic discussion? You're asking for the respondent's testimony about how she was contacted by Mr. Ostroushko?
MR. COOK: Yeah. I am.
THE COURT: Okay.
So, I think she answered that question.
So, what's the next question?
MR. COOK: Okay.
BY MR. COOK:
Q. Also, you said that the Ostroushko family beat you -- or, you know, they attacked you in front of the entire nation; is that correct?
A. Yes.
Q. Okay.
So, when you say the entire nation, is that

because you were broadcasting for Turning Point USA or as an influencer?
A. I'm not for Turning Point USA. Again, I have my own following, and I'm a reporter that is heavily followed for protest coverage. So, I knew a lot of people were going to see this.
Q. Okay.
So is it foreseeable that if a lot of people were going to see this, that they would have reactions, you know, on your Instagram or otherwise?
A. To me being assaulted, yes.
Q. Okay. Well -- okay.
As you characterize it as you being assaulted, would they also have reactions to you pushing Paige Ostroushko's face?
A. Yes.
Q. Did you foresee that --
MR. FRANKLIN-MURDOCK: Objection; calls for speculation, Your Honor.
THE COURT: Sustained. It does.
BY MR. COOK:
Q. So, it's possible that if you have a large, what do you call it, social media following, that -- that you're aware that -- that -- that your followers would also have strong reactions where they might potentially

contact the Ostroushkos; is that correct?
A. No, I don't know how people --
MR. FRANKLIN-MURDOCK: Objection; calls for speculation.
THE COURT: Yeah. Sustained.
A. -- are going to react.
THE COURT: There are so many -- I -- we need to break down the questions, so that we can all keep track of what's being asked and answered.
BY MR. COOK:
Q. Based on your large following, Ms. Hernandez, do you think that it was foreseeable that some of your followers might -- I'm asking you if you think that it's at all possible anywhere in the universe, foreseeable that any of your followers, as a result of -- you know, of what you're posting, might harass the Ostroushko family?
MR. FRANKLIN-MURDOCK: Objection; vague. Calls for speculation.
I mean, counsel is asking her to testify about the reaction of, according to them, over a million people.
THE COURT: Overruled. I think that's something that your client can answer and have an opinion about.

Ms. Hernandez.
MS. HERNANDEZ: I guess my response is I can't say what happens, specifically, on this massive of scale.
BY MR. COOK:
Q. Okay.
But you -- you also testified that you did -- you did create a post where you told people that you don't agree with the Ostroushkos being doxxed; is that correct?
A. Yes. After I did the reaction -- so --
Q. Okay. So, yes. Thank you.
And then, when you -- when you posted that, it said that you agreed(as spoken) with the Ostroushkos being doxxed --
A. I didn't say I agreed --
Q. -- therefore you think it's foreseeable --
A. I didn't say that I agreed with them being doxxed. I said that I --
Q. That you disagreed with them being doxxed.
A. -- disagreed.
Q. Yes.
So, therefore, you saw -- therefore, based on that post, it is foreseeable so that some of your followers might actually attack the Ostroushkos; is

that correct?
A. No.
MR. FRANKLIN-MURDOCK: Objection; argumentative. We're talking about different posts here.
MS. HERNANDEZ: Yeah.
THE COURT: Sustained.
MR. COOK: Okay.
BY MR. COOK:
Q. Also, you said you do coverage -- part of your point-and-shoot coverage is about political violence on both sides of the political spectrum; is that correct?
A. Correct.
Q. Okay.
So, therefore, based on your experience with political violence, that it might -- was it foreseeable -- Would you agree that it was foreseeable that some of your -- some of your followers might harass the Ostroushkos?
MR. FRANKLIN-MURDOCK: Objection; asked and answered, relevance, calls for speculation.
MR. COOK: Your Honor, I'd say I'm asking the question in a different context.
THE COURT: Can --
So, it has not been asked and answered. It

is relevant.

So, I would ask that Ms. Hernandez respond to the question.

MS. HERNANDEZ: I would say that after this situation, yes, I could foresee now a response. But I've never had a response like this before, so, no, it was not foreseeable at the time of me posting this.

BY MR. COOK:

Q. Yes or no, Ms. Hernandez?

A. Ask the question to me again --

Q. It's foreseeable --

A. -- please.

Q. It's foreseeable that your followers --

Based on your coverage of political violence, it's possibly foreseeable that some of your followers might harass the Ostroushkos; is that correct?

Yes or no?

MR. FRANKLIN-MURDOCK: Your Honor, now it is asked and answered.

THE COURT: It has been asked and answered. Correct.

And, Ms. Hernandez said --

MR. COOK: Okay.

THE COURT: Okay.

Go ahead.

MR. COOK: Okay.
BY MR. COOK:
Q. And you stated that you were critical of the current Administration; is that correct?
A. Yes.
MR. FRANKLIN-MURDOCK: Your Honor, relevance?
THE COURT: Sustained.
MR. COOK: Well, I'm getting to that.
THE COURT: Oh. Okay. Get there.
MR. COOK: If I could just ask a question. Okay?
THE COURT: Okay.
BY MR. COOK:
Q. And when you're critical of the -- you're critical of the Administration --
THE COURT: Wait.
MR. FRANKLIN-MURDOCK: Is it just me or did we lose Mr. Cook?
THE COURT: We lost --
BY MR. COOK:
Q. Okay.
So when you stated that you were.
MR. COOK: Actually, can you hear me?
THE COURT: We can't see you, sir.
MR. COOK: Making sure you guys can hear me.

Can you hear me?

THE COURT: We can.

Where did your video go?

MR. COOK: Just a moment.

Can you hear me?

THE COURT: Yes.

MS. HERNANDEZ: Yes.

MR. COOK: Okay. Okay. Okay. Got it. Got it. Got it.

BY MR. COOK:

Q. When you were critical of the Administration, was it foreseeable that some of your followers, who -- you know, for say, the news organization that you work with, might harass you for being critical of the Administration?

MR. FRANKLIN-MURDOCK: Objection; relevance. Calls for speculation.

THE COURT: Sustained.

Next question, Mr. Cook.

MR. COOK: Okay.

BY MR. COOK:

Q. You previously heard Ms. Ostroushko testify that she's experienced trauma as a result of being harassed by your followers.

Did you hear that testimony?

A. Yes.
Q. Okay.
Do you believe -- and you previously stated that you think that the word trauma is overused; is that correct?
A. Yes.
Q. Okay.
And why do you think that it's overused?
A. I think in modern-day society, it's overused. I wasn't equating that to your client though.
Q. Okay. You --
So you didn't equate that to my client; is that correct?
A. No.
Q. Is that what you just said?
A. Yeah. I said I didn't equate that to your client.
Q. Okay.
So you agree that based on, you know, her experiences after this incident, that she may be experiencing some trauma; is that correct?
MR. FRANKLIN-MURDOCK: Objection; calls for speculation.
Frankly, it calls for expert opinion.
THE COURT: I mean --
MR. COOK: Expert opinion?

She said it was overused, Your Honor.

THE COURT: Yeah. I think Mr. Cook is just asking --

MR. COOK: She's got an opinion about it.

THE COURT: Okay. I'm going to overrule the objection.

Can you answer that, Ms. Hernandez?

MS. HERNANDEZ: Sure. I'll just say that I can't speak to her personal experience.

THE COURT: Okay. That's the answer.

Next question.

BY MR. COOK:

Q. You -- yeah. You admitted that -- you do updates that are relevant to national news; is that correct?

A. Yes.

Q. Okay.

You also admitted that you made updates regarding, I guess, the progress of seeking justice against the Ostroushko family; is that correct?

A. Yes.

Q. Okay.

Now, when you make these updates, in terms of seeking justice against the Ostroushko family, do you agree that it was foreseeable that some of your followers might harass the Ostroushko family based on

those updates?

Yes or no?

MR. FRANKLIN-MURDOCK: Objection; compound. We're talking about multiple updates here.

If counsel wants to ask her about an update --

MR. COOK: I only asked her about one update.

THE COURT: Overruled.

MR. COOK: I asked her about one update.

THE COURT: This is -- overruled.

Ms. Hernandez, can you answer that question, please?

MS. HERNANDEZ: Sure.

Which update are you referencing, Mr. Cook?

MR. COOK: I'm referencing the update that you said -- where you said -- where you said that you were seeking justice against the Ostroushko family.

BY MR. COOK:

Q. Was it foreseeable, yes or no, that your followers might harass the Ostroushkos?

A. At that time, not foreseeable.

Q. Okay.

So are you saying yes or are you saying no?

MR. FRANKLIN-MURDOCK: Objection --

A. I'm saying --

MR. FRANKLIN-MURDOCK: -- she answered very plainly.

MR. COOK: She didn't answer.

THE COURT: She did answer.

MR. COOK: I asked a yes or no question. Move to strike.

I'm sorry.

THE COURT: She did answer three different times, counsel, in the variety of ways --

MR. COOK: Okay.

THE COURT: -- that you've asked the question.

MR. COOK: Got it.

BY MR. COOK:

Q. Ms. Hernandez, when you -- when you posted about -- you admitted that you posted about the lawsuit that you brought against the Ostroushkos; is that correct?

A. Yes. Because it was relevant to the case.

Q. Okay.

And then, when you posted about the lawsuit that you brought against the Ostroushkos, do you believe that it was foreseeable -- would you agree that it was foreseeable that your followers or your supporters might harass the Ostroushkos?

Yes or no?

A. Not that I was aware of.
Q. Okay.
When you -- you posted about the criminal case against the Ostroushkos.
Do you remember testifying about that?
A. Yes.
Q. Okay.
And when you posted information about the criminal case against the Ostroushkos, would you agree that it was foreseeable that your supporters and followers might harass the Ostroushkos based on what you posted about the criminal case?
Yes or no?
MR. FRANKLIN-MURDOCK: Your Honor, given --
A. Again, it's --
MR. FRANKLIN-MURDOCK: -- the continuing nature of these questions -- hold on. Let me --
Given the continuing nature of these objections, I'm going to object -- or, these questions -- I'm going to object based on relevance.
Minnesota's restraining order statute doesn't ask whether the respondent --
MR. COOK: Your Honor, given these objections, I'm moving to strike everything counsel said.

THE COURT: Mr. Cook.

Mr. Cook, you can't speak over people. We need to make a clear record.

MR. COOK: Okay.

THE COURT: And so I need to hear what Mr. Murdock is saying. You got to the middle of the statute comment, counsel.

Go ahead.

What are you saying?

MR. FRANKLIN-MURDOCK: Thank you, Your Honor.

The statute is about whether Ms. Hernandez engaged in harassment, not whether she did something and whether it was reasonably foreseeable that somebody else might do something in response. So, I think we're far afield of what the statute asks.

THE COURT: I agree.

Next question, Mr. Cook, if there are any.

MR. COOK: Your Honor, no further questions.

THE COURT: Is there a redirect, counsel?

Mr. Murdock?

MR. FRANKLIN-MURDOCK: Just one, Your Honor.

And as you can see, my video got kicked off again, but I just have one question for Ms. Hernandez.

THE COURT: Go ahead.

R E D I R E C T E X A M I N A T I O N

BY MR. FRANKLIN-MURDOCK:

Q. Ms. Hernandez, you mentioned that you were basically assaulted in front of the whole nation.

Do you remember saying that?

A. Yes.

Q. And you had posted videos about what happened that day, correct?

A. Yes.

Q. Isn't it true that other people who were there at the protest published viral videos of you getting attacked and that those were posted online with no involvement from you?

MR. COOK: Misstates evidence, Your Honor.

THE COURT: Well, it assumes facts not in evidence, so --

MR. COOK: Assumes facts.

THE COURT: -- I don't think it misstates anything, but -- I can --

Can you finish your answer, Ms. Hernandez?

I'll listen to it.

MS. HERNANDEZ: Thank you.

Yes, it was other streamers who were there that day as well. And, actually, the first clip that I posted about this incident was not my own clip. It was

actually from a streamer who was on the ground that day.

BY MR. FRANKLIN-MURDOCK:

Q. And Ms. Hernandez, do you recall that we watched a video on the Instagram posted by Oskar Quentin earlier?

I believe that's Exhibit 205.

A. Yes.

Q. And that video was posted online with no involvement from you. Meaning, you didn't post it.

You didn't tell Mr. Quentin to post it; is that correct?

A. Correct.

And if I remember correctly, he also went on CBS News and he went on a national news network to distribute that content as well.

Q. So do you believe that if you had done nothing on April 11th -- you know, don't post about it, don't talk about it.

If you had been completely silent about it, do you believe the incident still would have gotten attention?

A. Yes. Especially since.

MR. COOK: Calls for speculation.

THE COURT: It does not call for speculation. Well, it does call for speculation. I think under the

circumstances, we can listen to the answer.

MS. HERNANDEZ: Yes. There were multiple left-wing streamers who have since made content about this, have gone on national news about this. The Ostroushkos themselves went on multiple media, interviews themselves about this. So, yes, I do believe, even if I had not posted it myself, it would have gotten the attention and coverage.

MR. FRANKLIN-MURDOCK: No further questions, Your Honor.

THE COURT: Recross just on those questions, Mr. Cook.

MR. COOK: Yeah. I mean -- okay.

R E C R O S S - E X A M I N A T I O N

BY MR. COOK:

Q. So, you know, in addition to what you call the left-wingers going on national news, you also posted about -- you made a post about their -- the Ostroushkos' GoFundMe page; is that correct?

A. Yes.

MR. FRANKLIN-MURDOCK: Objection; beyond the scope of redirect.

THE COURT: It is beyond the scope, Mr. Cook.

MR. COOK: Is it? Okay. All right. All right.

You know what? No further questions, Your Honor.

THE COURT: Okay. And both parties rest then?

MR. FRANKLIN-MURDOCK: Yes, Your Honor.

MR. COOK: Petitioners rest.

THE COURT: All right.

Well, we got it done in the time allotted to us, so well done, everyone. I think I have what I need. I will take this matter under advisement. I have 90 days to get an order out. It will not take that long. We will have an order to you hopefully by early next week.

So, I thank you all for your time, and the ex parte order that is in place remains in place pending my final order.

All right, everyone?

Any questions?

MR. FRANKLIN-MURDOCK: Thank you, Your Honor.

MR. COOK: Thank you, Your Honor.

THE COURT: You're welcome. Thank you.

No questions before we leave?

MS. OSTROUSHKO: Thank you, Your Honor.

THE COURT: Oh, wow. Okay.

MS. HERNANDEZ: Thank you, Your Honor.

THE COURT: Bye, everyone. Have a good day. Take care.

MR. FRANKLIN-MURDOCK: Thank you. You as well, Your Honor.

MR. COOK: Thank you.

(The proceedings were concluded.)

# REPORTER'S CERTIFICATE

I, Crystal A. Ziebarth, do hereby certify that I am an Official Court Reporter for the Seventh Judicial District in the State of Minnesota, and as such reporter, that the proceedings were transcribed into writing by computer-aided transcription, and that the transcript is a true and accurate record of the testimony given to the best of my ability.

Dated: September 12, 2026

/S/ Crystal Ziebarth
___________________________________

Crystal A. Ziebarth
District Court Reporter
C859 Government Center
300 South Sixth Street
Minneapolis, MN 55487
(612)540-7985